OPINION OF THE COURT
 

 Simons, J.
 

 Defendant was indicted on multiple charges involving the unlawful sale of securities. Following a jury trial he was found guilty of one count of fraud in violation of General Business Law § 352-c (1) and one count of unregistered sale of securities in violation of section 359-e (3) of the General Business Law. On appeal the Appellate Division modified the sentence, but sustained the convictions.
 

 In an opinion by then Justice Levine, the Court upheld defendant’s conviction for fraud, noting that the term "fraud” is broadly defined for purposes of the General Business Law, and that the jury could have determined that defendant’s oral misrepresentations to the investors fell within its scope. It also rejected defendant’s argument that he was not subject to the General Business Law’s registration requirements because these transactions were personal sales of stock in a private corporation, not a public offering of securities. Finally, the Court found without merit defendant’s claim that he had been denied effective assistance of counsel at trial because his attorney, who had been involved in drafting the distribution and investment contract, could not both testify and represent defendant at trial. The Court ruled that defendant had failed to demonstrate any significant possibility of conflict of interest, or any effect the circumstances had on the conduct of the defense. A Judge of this Court granted leave to appeal so that we could determine whether this was a public or private offering of securities within the meaning of the statute. We now affirm.
 

 I
 

 In 1988 defendant, the owner of the Four Seasons health food store and cafeteria in Saratoga, decided to distribute and
 
 *659
 
 market in the United States a health food product called Nutri-King, a mixture of soy bean and rice manufactured in India. Defendant had entered into an agreement with the manufacturer, obtaining sole distribution rights in the United States. To finance the venture, defendant sought investors who would provide him with cash payments and in exchange receive capital stock in a corporation he planned to form. Defendant orally assured potential investors that the moneys would be placed in certificates of deposit in escrow and spent solely to purchase the product, and that they would eventually receive stock in the planned corporation. Ultimately, 12 individuals invested an aggregate of $100,000 in the venture. Each entered into a written agreement with defendant, an agreement which did not, however, embody the oral promises.
 

 Defendant’s efforts to market the product were unsuccessful and eventually he was indicted on six counts of grand larceny in the third degree and eight counts of criminal violation of article 23-A of the General Business Law (the Martin Act). The Martin Act charges consisted of six counts of fraud in the sale of securities in violation of General Business Law § 352-c (6), one count of fraud in the sale of securities in violation of General Business Law § 352-c (1), and one count of unregistered sale of securities in violation of General Business Law § 359-e (3).
 

 At trial, six of the investors testified. The substance of their testimony was the same: each had been induced to invest in defendant’s planned corporation by his assurances of future success and oral promises that their investments would be secure. When it subsequently became apparent to them that no escrow account had been set up, and no stock was forthcoming, they individually demanded an accounting or a return of their money. No accounting, refund or stock was ever issued. Eventually they learned that although defendant had attempted to promote and arrange for distribution of NutriKing, he had commingled their moneys with his own funds and spent most of it for personal uses, including payment of a loan to his father-in-law, purchase of two automobiles and financing of his daughter’s education. Defendant did not testify at the ensuing trial, but the People introduced his Grand Jury testimony. Before the Grand Jury, defendant denied that he had made any oral promises to the investors and testified that he felt free to use the investor’s funds for his own purposes while he was seeking distributors for Nutri-King.
 

 
 *660
 
 II
 

 Article 23-A of the General Business Law regulates the offer and sale of securities and commodities in and from New York.
 
 [1]
 
 The purpose of the statute is remedial: to protect the public from fraudulent exploitation in the offering and sale of securities. In 1955, section 352-c was added, imposing for the first time criminal liability for conduct constituting "fraudulent practices” under the Act, conduct which, in some instances, may be criminal because deceptive or misleading even absent proof of scienter or intent (General Business Law § 352-c [1];
 
 see,
 
 Kaufmann, Practice Commentary, McKinney’s Cons Laws of NY, Book 19, General Business Law art 23-A, at 16-19).
 

 Although the Martin Act was enacted in 1921, its present form generally tracks the Federal securities acts of 1933 and 1934. Accordingly, we have looked to Federal court decisions construing those statutes when interpreting our own
 
 (see, All Seasons Resorts v Abrams,
 
 68 NY2d 81,
 
 supra).
 
 Although there are important differences between the State statute and its Federal counterpart, both seek to regulate parties selling securities and to advance the public’s knowledge about the securities offered for sale
 
 (see,
 
 15 USC § 77aa; General Business Law § 359-e [3]). Unlike Federal law, however, there is no State requirement for registering securities before they are offered for sale, except in the three specific areas of real estate securities, theatrical syndication offerings, and issues offered solely intrastate (General Business Law § 359-ff). Accordingly, defendant was not required to register these securities but he was subject to the provisions of section 359-e requiring dealers to register with the New York State Department of Law because he was selling securities he had issued (General Business Law § 359-e [1]). He was subject to this registration requirement, however, only if he was selling securities "to the
 
 *661
 
 public”
 
 (see,
 
 General Business Law § 359-e [1] [a]; [3]). That qualification frames the issue before us: were the transactions at issue public offerings or personal sales of stock in a private corporation to which the statute does not apply?
 

 Ill
 

 Because there is no controlling New York authority establishing what constitutes a public offering, the Appellate Division looked to Federal case law for guidance. In
 
 Securities & Exch. Commn. v Ralston Purina Co.
 
 (346 US 119), the Supreme Court, in addressing the private offering exemption of the 1933 Securities Act, looked first to the purpose of the provision which required the registration of securities.
 
 [2]
 
 The Court concluded that the purpose of the Act was "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions”
 
 (id.,
 
 at 124). Accordingly, it held that "the exemption question turns on the knowledge of the offerees”
 
 (id.,
 
 at 126-127). The question was further developed by the United States Court of Appeals in
 
 Doran v Petroleum Mgt. Corp.
 
 (545 F2d 893 [5th Cir 1977]), which noted that its own previous cases had identified four relevant factors: the number of offerees and their relationship to each other and to the issuer, the number of units offered, the size of the offering, and the manner of the offering. Because the Supreme Court in
 
 Ralston Purina
 
 had pointed to "the knowledge of the offerees” as the key to the exemption, the
 
 Doran
 
 court concluded that the touchstone of the inquiry was the first factor, the number of offerees and their relationship to each other and the offeror and, to a lesser degree, the manner of the offering. In evaluating that first factor, the court deemphasized the number of offerees. Acknowledging that the more offerees, the greater the likelihood of a public
 
 *662
 
 offering, the court recognized that "Cj]ust as an offering to few may be public, so an offering to many may be private”
 
 (id.,
 
 at 901). What concerned it most was that there be disclosed to the offerees, or that they have access to, information that a registration would provide.
 

 The New York statute does not require registration of the securities in all cases and apparently did not require it here. Section 359-e (3) requires only that a dealer of securities file with the Department of Law a statement relating to his or her business history for the five preceding years, criminal record, educational background and the partners or associates in the business. The statute, like its Federal analog requiring dealer registration, is in large measure designed to permit the Attorney-General to investigate sellers and regulate their conduct. It deals with disclosures related to the seller, not the security, and is useful to offerees in only the general sense of warning them about those they are trusting with their money. Thus, the
 
 Ralston Purina
 
 and
 
 Doran
 
 tests, which focus on information about the security, must be adapted for State purposes to reflect more than the availability of information about the securities themselves. The court must also consider the information that might otherwise have been available to the offerees if the offeror had complied with the registration statute and the extent to which the relationship of the parties served as a reasonable substitute for information which it would have disclosed.
 

 The Appellate Division correctly addressed all four
 
 Do-ran
 
 factors as the analytical framework for determining whether an offering is public or private for purposes of General Business Law § 359-e (3), but it implicitly, and correctly in our view, declined to conclude, as the
 
 Doran
 
 court did, that the availability of information about the investment was virtually determinative.
 

 The sole prior New York case to address the issue of public versus private offering used the same approach as the Appellate Division, even in the context of a sale of cooperative interests in realty, one of the situations in which New York law requires filing of a prospectus
 
 (see, People v Glenn Realty Corp.,
 
 106 Misc 2d 46). Although the court in
 
 Glenn Realty
 
 declined to deem the offering public, it based that ruling on consideration of all the relevant factors, the facts that the parties had close relationships as neighbors and friends over several years, a history of extensive past dealings, and representation by counsel.
 

 
 *663
 
 IV
 

 After similarly weighing the four factors, we conclude that the evidence in the record supports the finding that this offering, though relatively small, was public. There was trial evidence that defendant offered 200 shares of stock in a proposed corporation formed to market Nutri-King. The only asset of the corporation was a contract to acquire the product from India and sell it throughout the United States. The business was to be run by defendant who, it developed at trial, had been a teacher many years ago but went into the business of training race horses and managing health food stores. He had operated Four Seasons with his wife for about
 
 SV2
 
 years before embarking on the Nutri-King venture.
 

 There were 12 investors but it does not appear that many of them had any knowledge of this background. One, a Dr. Winters, had known defendant about 10 years and had jointly owned horses with him, but most of those testifying had been recently introduced to defendant by Dr. Winters or by Thomas Viola or had met him casually at a local bagel shop or at the track. Dr. Winters, who introduced at least two investors to defendant, received his shares free, and Mr. Viola was paid fees for locating two other investors. The entire incident from beginning to disillusionment lasted approximately a year and several of the investors were involved for periods of only a few months. The record establishes that most of them knew little about defendant or each other. Indeed, when the venture faltered some of the investors advertised in the newspaper to locate others unknown to them who might have invested and similarly lost their money.
 

 Moreover, although the investors did not know it, they were not treated equally. Some paid $500 a share for their stock, others, unaware of the lower price, paid as much as $1,000 a few months later and, as noted, Dr. Winters received his shares free. Most of the investors received contracts from defendant, although several did not receive the executed contract, or have an opportunity to examine it, until their money had been delivered to defendant and deposited to his account. Indeed, one investor was presented with a contract that denied him voting rights in the corporation.
 

 Thus, it is clear that most of the investors knew little about defendant, the securities he was issuing or their fellow investors. The stock was issued on an ad hoc basis to any who could be induced to buy whether they were acquaintances or strang
 
 *664
 
 ers. The relationship of many investors was far from intimate, and few if any had sufficient knowledge or access to information of defendant’s background and experience to substitute for what could have been learned about defendant from a State registration, or what could have been learned about the securities under the requirements of Federal law
 
 (see,
 
 15 USC § 77aa). As the Appellate Division found, they had to rely completely upon defendant to learn the financial prospects of the new enterprise and when they realized that they did not have all the material information and sought to get it from defendant, "defendant evaded their inquiries”
 
 (People v Landes,
 
 192 AD2d 1, 5). While this evidence of conduct subsequent to the purchases is not controlling, it indicates that the relations between the offerees and the defendant was not close enough to obviate the need for Martin Act protection of the public from "fraudulent exploitation in the offering and sale of securities and the protection of investors from such practices”
 
 (see, Landes,
 
 192 AD2d, at 4, citing
 
 CPC Intl. v McKesson Corp., 70
 
 NY2d 268, 277).
 

 V
 

 We have examined the remaining contentions advanced by defendant and reject them for the reasons stated by the Appellate Division.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Smith and Ciparick concur; Judge Levine taking no part.
 

 Order affirmed.
 

 [1]
 

 . Defendant makes an argument that the transactions at issue were not a sale of securities but an "investment contract”
 
 (see, Securities & Exch. Commit, v Howey Co.,
 
 328 US 293). The argument is rejected for three reasons: first, our Court has implicitly included investment contracts as "other securities” for Martin Act purposes
 
 (see, All Seasons Resorts v Abrams,
 
 68 NY2d 81); second, the
 
 Howey
 
 analysis depends greatly on the particularized and individualized terms of the contract, and it is clear defendant’s offer was available to anyone willing to invest; and third, it is clear that what defendant ultimately sold to the investors was stock in the company he planned to organize, even though such stock never materialized.
 

 [2]
 

 . The procedural posture of the cases differs from that of the Federal cases to some degree. The Securities Act of 1933 provides in section 4 (2) (15 USC § 77d [2]) an automatic exemption from registration requirements for private offerings; the burden is on the defendant to demonstrate that the transaction at issue is a private offering. Under General Business Law § 359-f (2), the Attorney-General may, upon application, grant exemptions from the registration provisions of section 359-e under certain conditions, one of which is a sale or offer of securities made to fewer than 40 persons; however, defendant made no such application. Because the statutory section at issue here (General Business Law § 359-e [3]) is not an exemption provision, it appears incumbent upon the District Attorney to establish that the transaction is a public offering and that General Business Law § 359-e (3) applies.