No. 87,452

DANIEL BRENNER and ROGER KLEIN, *Appellants*, v.
OPPENHEIMER & CO., INC., *Appellees*.

(44 P.3d 364)

 Opinion filed
April 19, 2002. 

*Joseph C. Long*, of Norman, Oklahoma, argued the cause, and *Diane A. Nygaard, Robert R. Barton*, and *Robin R. LaFollette*, of The Nygaard Law Firm, of Kansas City, Missouri, were with him on the briefs for appellants.

*Tracy J. Cowan*, of Thompson Coburn LLP, of St. Louis, Missouri, argued the cause, and *David Wells*, of the same firm, and *James J. Cramer*, of Payne & Jones Chartered, of Overland Park, were with him on the brief for appellees.

The opinion of the court was delivered by

ABBOTT, J.: Appellants Roger Klein and Daniel Brenner opened brokerage accounts with L.T. Lawrence, a company based in New York now in bankruptcy. Klein managed both accounts. Oppenheimer & Co., Inc. (Oppenheimer), a clearing brokerage, cleared trades for L.T. Lawrence, which had no authority to clear trades itself. L.T. Lawrence sold unregistered securities through Oppenheimer to Klein and Brenner, and Klein and Brenner brought suit against individual agents of L.T. Lawrence and against Oppenheimer for violation of the Kansas Securities Act.

When they opened their accounts, Klein and Brenner had signed client agreements with Oppenheimer containing a choice of law provision stating that the laws of the State of New York would govern. Ruling on a motion for summary judgment, the district court stated that if Kansas law applied, Oppenheimer would be liable. The district court held, however, that the contractual choice of law provision was enforceable and that, under New York law, Oppenheimer was not liable. Therefore, the district court entered judgment for Oppenheimer. Klein and Brenner timely appealed

the district court's entry of judgment against them. This matter comes before us pursuant to a K.S.A. 20-3018 transfer.

The underlying facts of this case are uncontroverted. Brenner is a resident of Kansas City, Missouri, and Klein is a resident of Johnson County, Kansas. Brenner is a retired attorney who is in poor health, and his nephew, Klein, manages Brenner's financial affairs. Both L.T. Lawrence and Oppenheimer were located in New York and were licensed as registered broker-dealers in Kansas.

In June 1996, Klein opened an individual account with L.T. Lawrence brokerage from his home in Kansas. In July 1996, Klein opened an account from his home in Lawrence on behalf of Brenner with L.T. Lawrence.

The purchase or sale of securities requires a series of complicated steps. In its opinion, the district court described the transactions involved in the exchange of securities as follows:

"A buyer first opens a brokerage account with a broker, who is the agent of the buyer. The broker has registered representatives who work with the buyer. An actual purchase of stock can occur in two ways: either the buyer calls his registered representative and tells him that he wants to buy a particular stock (an 'unsolicited transaction') or the registered representative calls the buyer and recommends a particular stock (a 'solicited transaction'). Larger brokerage houses have a seat on the stock exchange and they buy directly for clients. Smaller brokerage houses do not have a seat on the exchange, so they contract with one of the larger houses which does have a seat, and the larger broker executes the purchase. The larger broker is known as the 'clearing broker.' . . . A brokerage house like L.T. Lawrence is known as an 'introducing broker.' "

Here, Oppenheimer acted as the clearing broker for L.T. Lawrence in accordance with a clearing agreement. Oppenheimer afforded L.T. Lawrence the operational capacity to clear trades at various stock exchanges and also provided administrative support for processing transactions and generating customer account records. Oppenheimer did not, however, solicit, recommend, or offer the sale or purchase of any of the securities purchased or sold by Klein and Brenner.

In their petition, Klein and Brenner alleged that they believed the accounts "were under the control of Oppenheimer and relied on its reputation in opening and maintaining the accounts." The clearing agreement between Oppenheimer and L.T. Lawrence,

however, mandated that L.T. Lawrence provide a disclosure statement to its customers entitled LTL Account Disclosure Statement. In pertinent part, that disclosure statement stated:

"I. Opco is the New York Stock Exchange member correspondent for LTL with whom you opened your securities account. LTL is independent of Opco and has retained Opco to provide certain record keeping and operational services, which may include execution and settlement of securities transactions, custody of securities and cash balances and extension of credit on margin transactions. These services are provided under a written Clearing Agreement between Opco and LTL . . . .

"II. Responsibilities of LTL

'A. LTL has a general responsibility for servicing your securities account through its own registered representatives in accordance with its own policies and applicable securities laws and regulations.

. . . .

'C. LTL is responsible for any investment advice or recommendations for investment management services that may be provided to you and for determining whether particular types of transactions which may be recommended to you (*e.g.* margin, options, short sales) are appropriate for you.

'D. LTL is responsible for knowing the facts about any orders for the purchase or sale of securities which you may authorize.

. . . .

'G. LTL is responsible for supervision of the activities of the individual registered representative who services your account and for the resolution of any complaints regarding the handling of your account.

'H. In all of the above matters relating to the servicing of your account, Opco has no involvement and assumes no responsibility.

"III. Responsibilities of Opco

'A. In general, Opco is responsible only for those services provided at the request or direction of LTL as contemplated by the Clearing Agreement.

'B. Opco will create computer based account records on your behalf in such name(s) and with such address(es) as LTL directs.

'C. Opco will process orders for the purchase, sale or transfer of securities for your account as LTL directs. Opco is not obligated to accept orders for securities transactions for your account directly from you and will do so only in exceptional circumstances.

. . . .

'I. Opco will provide to LTL written reports of all transactions processed for your account to assist LTL to supervise the handling of your account in accordance with regulatory standards to which LTL is subject.

. . . .

"IV. OPCO DOES NOT CONTROL, AUDIT OR OTHERWISE SUPERVISE THE ACTIVITIES OF LTL OR ITS REGISTERED REPRESENTATIVES. OPCO DOES NOT VERIFY INFORMATION PROVIDED BY LTL REGARDING YOUR ACCOUNT OR TRANSACTIONS PROCESSED FOR YOUR ACCOUNT NOR UNDERTAKE RESPONSIBILITY FOR REVIEWING THE APPROPRIATENESS OF TRANSACTIONS ENTERED BY LTL ON YOUR BEHALF."

Oppenheimer mailed all of the correspondence, statements, and confirmations concerning the two accounts to Klein's home in Kansas. This lawsuit arose after L.T. Lawrence, through Oppenheimer, sold Klein and Brenner unregistered securities. Klein and Brenner allegedly purchased 20,000 shares of International Nursing Services, Inc.; 109,400 shares of Ecotyre Technologies, Inc.; 15,000 shares of Idenet, Inc.; 20,000 shares of Nouveau International, Inc.; 10,000 shares of Aegis Consumer Funding; 50,000 shares of Eastwind Group; 20,000 shares of MetroGolf, Inc.; 10,000 shares of A Wts Ecotyre Technologies, Inc.; and 9,000 shares of QPQ Corp.

The sale of unregistered, nonexempt securities is prohibited under Kansas law by K.S.A. 17-1255, and is also prohibited by federal securities law. The stock purchases all occurred between June 1996 and January 20, 1997.

Before this litigation commenced, Klein and Brenner filed a request for arbitration. The arbitration claim was filed on July 22, 1997. In their statement of claim to the arbitration panel, Klein and Brenner alleged that "Oppenheimer has a history of clearing trades for many firms, like L.T. Lawrence, which have a history of abusive, high-pressure phone solicitations of penny stocks, some of whom have had their licenses revoked or have gone bankrupt. . . . Oppenheimer knew or should have known of the securities fraud perpetrated by L.T. Lawrence and is a knowing participant in the fraud." On January 28, 2000, without deciding the merits of the arbitration, the panel granted Klein's and Brenner's motion to dismiss. The panel referred the parties to their remedies at law without prejudice to any available claims or defenses.

On June 10, 1999, Klein and Brenner filed a petition with the District Court of Johnson County, Kansas, naming Oppenheimer,

John Bruni, Lawrence Principato, and Todd Edward Roberti as defendants. Bruni worked as a broker, Principato served as Chief Executive Officer, and Roberti was the President, Secretary and Treasurer of L.T. Lawrence. Klein's and Brenner's petition stated that "[a]s Lawrence is presently in bankruptcy, it is not a named Defendant." Service was effected on February 18, 2000, 3 weeks after the dismissal of the arbitration claim.

In their petition, Klein and Brenner advanced two theories for recovery against Oppenheimer under Kansas law. First, they alleged that Oppenheimer aided and abetted L.T. Lawrence and Bruni in violating K.S.A. 17-1255 and was therefore liable under K.S.A. 17-1268(a). Klein and Brenner alleged alternatively that Oppenheimer was a broker-dealer who materially aided in the sale of unregistered securities in violation of K.S.A. 17-1268(b).

In his deposition, Gary Emmerich, Oppenheimer's Director of Operations, testified that he personally investigated numerous client complaints of illegal sales against L.T. Lawrence. Emmerich stated that around the end of 1996 or early 1997, he began bringing client complaints about L.T. Lawrence to the attention of the legal department and others at Oppenheimer. Later, Oppenheimer made the decision to ask L.T. Lawrence to find another clearing broker. Emmerich testified that he received investor complaint letters against L.T. Lawrence alleging that L.T. Lawrence was a boiler room operation, that it ordered trades unauthorized by the customer, and committed possible acts of "churning," or excessive trading prohibited by rules of the NASD. However, Emmerich never alerted any regulatory authorities about the customer complaints received and stated that he knew of no one at Oppenheimer who made any regulatory filing with the Securities and Exchange Commission or alerted authorities.

Discovery also revealed that at the time Klein opened the two accounts with L.T. Lawrence, both he and Brenner signed client agreements with Oppenheimer containing a choice of law provision. The client agreement contains various provisions concerning short and long sales orders, transfer of funds, payment of loans on demand, maintenance of collateral, joint tenancy, interest charges, termination fees, etc.

The pertinent paragraphs of the client agreement state:

"In consideration of Oppenheimer & Co., Inc. ('Oppenheimer') accepting my account and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, put & call options, and other property. This agreement shall not become effective until accepted by you in your New York office. Acceptance may be evidenced by internal records maintained by [Oppenheimer].

. . . .

"5. ORAL AUTHORIZATIONS. I agree that you shall incur no liability in acting upon oral instructions given to you concerning my accounts, provided such instructions reasonably appear to be genuine.

. . . .

"18. APPLICABLE LAW AND REGULATIONS. This agreement and its enforcement shall be governed by the laws of the State of New York without giving effect to the choice of law or conflicts of law provisions thereof. All transactions for my accounts shall be subject to the regulations of all applicable federal, state and self-regulatory agencies including but not limited to the Securities and Exchange Commission, the various securities and commodity exchanges, the Municipal Securities Rulemaking Board, the NASD, the Board of Governors of the Federal Reserve System and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed. . . .

"21. SEVERABILITY. If any provision of this agreement is or becomes inconsistent with any applicable present or future law, rule or regulation, that provision will be deemed rescinded or modified in order to comply with the relevant law, rule or regulation. All other provisions of this agreement will continue and remain in full force and effect."

Klein filed an affidavit with the Johnson District Court stating that in January 1997, a trade of 9,000 shares of QPQ Corp. stock was identified as "unsolicited" on the trade confirmation statement from Oppenheimer. Klein, however, stated that "[t]here is no question in my mind that this trade was, in fact, solicited."

According to Klein's and Brenner's calculations, the statutory damages for the sale of unregistered securities would total $1,022,998.07. The district court, however, observed in its memorandum opinion that the facts which would definitively fix the amount of damages remain in dispute, largely due to certain affirmative defenses available to Oppenheimer.

After discovery, all parties moved for summary judgment. The district court conducted a hearing on the parties' cross-motions for summary judgment on April 12, 2001. The Honorable Janice D.

Russell, Judge of the District Court of Johnson County, filed a memorandum opinion. In that opinion, Judge Russell remarked that the issue of the liability of a clearing broker for the sale of unregistered securities appeared to be a case of first impression in Kansas.

The memorandum opinion reached several conclusions of fact and law. First, the district court found that Klein's and Brenner's claims were not barred by the statute of limitations due to the tolling provision of K.S.A. 5-515. This finding has not been appealed. Second, the district court found that K.S.A. 17-1268(d) did not appear to prohibit the choice of law provision in the parties' contract. Therefore, the court determined that the choice of law provision in the client agreement was enforceable and held that New York law applied. Third, the district court found that under New York law, Oppenheimer, acting as a clearing broker, was not liable for the sale of unregistered securities. The court characterized Oppenheimer's involvement as "nothing more than ministerial," and held that since "Oppenheimer was not involved in any of the plaintiffs' decisional process," it was not liable to Klein and Brenner under New York law.

The opinion of the district court did not end at that point, however. Instead, the court provided additional analysis of the liability of Oppenheimer under Kansas law, ruling that under Kansas law, Oppenheimer would be liable for the sale of unregistered securities.

On June 20, 2001, a journal entry of judgment was filed in favor of Oppenheimer and against Klein and Brenner. On July 3, 2001, Klein and Brenner filed their timely appeal from the judgment of the district court.

For their first assertion of error, Klein and Brenner argue that the district court's decision to uphold the choice of law provision in Oppenheimer's standard form agreement ignores Kansas law and is contrary to this state's strong public policy favoring the protection of investors.

"The standard of review for a motion for summary judgment is well established. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 60-256(c). On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Jackson v. U.S.D. 259*, 268 Kan. 319, 322, 995 P.2d 844 (2000).

The facts on appeal are uncontroverted. We must decide whether, as a matter of law, the district court correctly entered judgment for Oppenheimer based on the language found in the client agreement.

"Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. [Citation omitted.] The interpretation and legal effect of written documents are matters of law upon which our standard of review is unlimited. [Citation omitted.]" *City of Topeka v. Watertower Place Dev. Group*, 265 Kan. 148, 152-53, 959 P.2d 894 (1998).

The State of Kansas passed the first blue sky laws in the nation in 1911. See L. 1911, ch. 133, sec. 1; L. 1913, ch. 141, sec. 1.

"The first legislative attempts to regulate securities transactions were effected on the state level, with the first general securities law being said to have been enacted by the State of Kansas in 1911, and with 48 jurisdictions having enacted such statutes by 1933. These statutes were said to be enacted to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines, and other fraudulent exploitations. A similar description of the early legislative purpose is that such acts were aimed at 'speculative schemes which have no more basis than so many feet of blue sky,' and this description has had a lasting influence in that state securities acts are commonly referred to as 'blue sky laws.'" 69A Am. Jur. 2d, Securities Regulation-State § 1, p. 759 (1993).

Twenty-two years later, Congress passed important federal laws designed to regulate securities and protect the public. See Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (2000). Federal securities laws do not act to preempt state regulation, however. Instead, federal statutes expressly indicate that nonconflicting state regulation of securities is allowed. "Section 18 of the Securities Act of 1933 . . ., § 28 of the Exchange Act, and § 18a of the Investment Advisers Act, provide clear and unequivocal congressional expression not to preempt state securities laws, and these savings provisions are not limited to state laws in effect at the time of passage

of federal laws." 69A Am. Jur. 2d, Securities Regulation—State §
13, p. 772 (1993).

> "It was clearly the intention of Congress to leave the States free to exercise
> such regulatory control over the sale of securities as does not conflict with the
> provisions of the Federal Act, and, in the absence of such a conflict, it is contem-
> plated that the States and the Federal government shall exercise concurrent ju-
> risdiction in this field." *Travelers Health Ass'n v. Com.*, 188 Va. 877, 897, 51
> S.E.2d 263 (1949), *aff'd* 339 U.S. 643 (1950).

Therefore, no federal preemption issue is presented which might
preclude the application of Kansas law.

In order for a state to assert jurisdiction, however, it must do so
in a constitutionally permissible manner.

> "In deciding constitutional choice-of-law questions, whether under the Due
> Process Clause or the Full Faith and Credit Clause, this Court has traditionally
> examined the contacts of the State, whose law was applied, with the parties and
> with the occurrence or transaction giving rise to the litigation. [Citation omitted.]
> In order to ensure that the choice of law is neither arbitrary nor fundamentally
> unfair [citation omitted], the Court has invalidated the choice of law of a State
> which has had no significant contact or significant aggregation of contacts, creating
> state interests, with the parties and the occurrence or transaction." *Allstate Ins.
> Co. v. Hague*, 449 U.S. 302, 308, 66 L. Ed. 2d 521, 101 S. Ct. 633 (1981).

One legal scholar has remarked that "to justify application of
forum law the Supreme Court only requires contacts with the fo-
rum state sufficient to create a state interest, even if another state
has a materially greater interest. The Court will not weigh interests,
it will just find them." Friedler, *Party Autonomy Revisited: A Stat-
utory Solution to a Choice-of-Law Problem*, 37 Kan. L. Rev. 471,
500 (1989).

This court has likewise observed that "[a]s long as Kansas has
' "significant contact or significant aggregation of contacts" . . . to
ensure that the choice of Kansas law is not arbitrary or unfair,'
constitutional limits are not violated. [Citation omitted.]" *Systems
Design v. Kansas City P.O. Employees Cred. Union*, 14 Kan. App.
2d 266, 269, 788 P.2d 878 (1990) (quoting *Shutts v. Phillips Pe-
troleum Co.*, 235 Kan. 195, 679 P.2d 1159 [1984], *rev'd in part on
other grounds* 472 U.S. 797, 821-22, 86 L. Ed. 2d 628, 105 S. Ct.
2965 [1985]).

Under the facts of this case, there are sufficient minimum contacts with both New York and Kansas to establish jurisdiction in either state. Oppenheimer was located in New York at all times relevant to this lawsuit. The district court found that "all offers and sales of these securities were directed to Mr. Klein in the state of Kansas and received by him in Kansas when he was physically present in the state. All communications, statements and confirmations were received by Mr. Klein in the state of Kansas." Therefore, in the event that the choice of law provision is unenforceable, the application of Kansas law over New York law would not present constitutional concerns.

The next step in our review is to determine whether an actual conflict exists between the laws of New York and the laws of Kansas.

In *Shutts v. Phillips Petroleum Co.*, 240 Kan. 764, 767, 732 P.2d 1286 (1987), *cert. denied* 487 U.S. 1223 (1988), this court wrote that "if the law of Kansas [is] not in conflict with any of the other jurisdictions connected to the suit, then there [is] no injury in applying the law of Kansas." In other words, if the outcome of this dispute would be the same under the laws of New York as under the laws of Kansas, the case presents a "false conflict." "Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the court need not decide the choice of law issue." *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994).

Here, Klein and Brenner advanced two theories for recovery under Kansas law: aiding and abetting another in the sale of unregistered securities in violation of K.S.A. 17-1268(a), and materially aiding in the sale of unregistered securities in violation of K.S.A. 17-1268(b). Kansas statutory law plainly imposes civil liability on "[a]ny person who offers or sells" an unregistered, nonexempt security, and holds "every broker-dealer or agent who materially aids in the sale" jointly and severally liable. K.S.A. 17-1268(a) and (b). In addition, Kansas statutes authorize the person buying the security to "sue either at law or in equity to recover the consideration paid for the security, together with interest at 15% per annum from the date of payment, costs, and reasonable attor-

ney fees, less the amount of income received on the security . . . or for damages." K.S.A. 17-1268(a).

Here, the district court concluded that "under New York law, Oppenheimer, as the clearing broker, has no liability for the sale of unregistered securities to [Klein and Brenner]." The district court justified its conclusion by citing two cases: *Katz v. Financial Clearing & Services Corp.*, 794 F. Supp 88 (S.D.N.Y. 1992), and *Connolly v. Havens*, 763 F. Supp. 6 (S.D.N.Y. 1991).

The State of New York's blue sky laws are encompassed in the Martin Act, N.Y. Gen. Bus. Law, Art. 23-A, § 352 *et seq.* (McKinney 1996). "The Martin Act 'prohibits various fraudulent and deceitful practices in the distribution, exchange, sale and purchase of securities,' [Citation omitted.] 'but does not require proof of intent to defraud or scienter.' [Citation omitted.]" *Cromer Finance Ltd. v. Berger*, 2001 WL 1112548, *3 (S.D.N.Y., Sept. 19, 2001). The Act authorizes the attorney general to regulate and enforce New York's state securities laws, and to redress harm suffered by individual investors. See *People v. Landes*, 600 N.Y.S.2d 292, 294, 192 App. Div. 2d 1 (1993) *aff'd* 84 N.Y.2d 655, 621 N.Y.S.2d 283, 645 N.E.2d 716 (1994).

In *CPC International Inc. v. McKesson Corporation*, 70 N.Y.2d 268, 276, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987), the New York Court of Appeals discussed the Martin Act. The *McKesson* court stated:

"In all the other States, except one, the Legislature has expressly recognized a private civil action for violations of the corresponding provision. Under the Martin Act, however, no private action has been expressly authorized. A majority of this court now holds that there is no cause of action impliedly created under section 352-c." 70 N.Y.2d at 275-76.

In *Granite Partners L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998), the court confirmed: "It is well established that there exists no private right of action for claims that are within the purview of the Martin Act." (citing *Vannest v. Sage, Rutty & Co., Inc.*, 960 F. Supp. 651, 657 n.6 [W.D.N.Y. 1997]).

In addition to limiting an individual's private right of recovery, the Martin Act fails to impose strict liability for the sale of unregistered securities. See N.Y. Gen. Bus. Law, Art. 23-A, § 352 *et*

*seq.* (McKinney 1996). Indeed, New York state securities laws only call for the registration of those securities that are distributed intrastate.

"All jurisdictions purporting to have adopted the Uniform Securities Act or the Revised Uniform Securities Act, except the District of Columbia, contain provisions calling for the registration of securities under certain conditions, although the complexity, procedure, and terminology vary greatly from one jurisdiction to another. A few of the jurisdictions, of which New York is a notable example, require registration only of intrastate distributions." 69A Am. Jur. 2d, Securities Regulation—State § 74, p. 827 (1993).

Because Kansas statutes explicitly authorize a private right of redress for the sale of unregistered securities while New York state law does not, and because New York law only requires the registration of intrastate securities, the district court correctly concluded that this dispute would not result in the same outcome in both jurisdictions. It is obvious to us that this case does not present a false conflict. Therefore, we must determine which jurisdiction's laws should govern.

Klein and Brenner contend that the district court erred when it found the choice of law provision in Oppenheimer's standard form agreement determinative. First, they contend that because Kansas follows traditional choice of law rules as reflected in the Restatement (First) of Conflict of Laws (1934), choice of law provisions in contracts are unenforceable, especially when contrary to the public policy of the state. Here, they maintain that the court failed to heed the long-established public policy of the State of Kansas for the protection of investors. Second, Klein and Brenner contend that the district court's decision is in contravention of the statutory nonwaiver provision found in K.S.A. 17-1268(d). Finally, they assert that other state courts with similar securities regulation statutes have held in these circumstances that choice of law provisions must yield to the pubic policy of the forum states' securities law.

Klein and Brenner contend that due to the strong public policy of the State of Kansas for the protection of investors, this court should refuse to enforce the choice of law provision in Oppenheimer's standard form agreement. The first prong of their assertion is that under the Restatement (First) of Conflict of Laws (1934), a

choice of law provision must yield to Kansas law when enforcement of the contract under foreign law would contravene the public policy of Kansas.

"When addressing choice-of-law issues, the Kansas [appellate] courts follow the Restatement (First) of Conflict of Laws." *Layne Christensen Co. v. Zurich Canada*, 30 Kan. App. 2d 128, Syl. ¶ 7, 38 P.3d 757 (2002). While Kansas courts have followed the Restatement (First) of Conflict of Laws, the Restatement (First) does not either bar or recognize contractual choice of law provisions. Kansas case law and the Uniform Commercial Code, however, recognize the principle of freedom to contract and, under most circumstances, permit parties to choose the law applicable to their agreement.

K.S.A. 84-1-105(1) provides that "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." In the absence of an explicit statement of the parties' choice of law, K.S.A. 84-8-110(b) and (e) provide guidance concerning choice of law issues involving securities intermediaries. Here, the client agreement specified that "[t]his agreement and its enforcement shall be governed by the laws of the State of New York," so it is unnecessary for us to turn to choice of law provisions of the investment securities chapter of the Uniform Commercial Code.

Oppenheimer claims that the proper test for enforceability under Kansas law when parties have agreed to a contractual choice of law provision focuses on whether the chosen forum bears a reasonable relation to the state whose law is chosen. The genesis of the reasonable relation test is the Restatement (Second) of Conflict of Laws § 187 (1969).

In support, Oppenheimer cites *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F. Supp. 2d 1269 (D. Kan. 1998). There, the United States District Court for the District of Kansas wrote that "[f]ederal courts in Kansas routinely enforce the parties' contractual choice-of-law provisions under Kansas choice-of-law rules. [Citation omitted.] Under Kansas law, the enforceability of a contractual choice-of-law provision turns on whether the forum selected bears a

reasonable relation to the contract at issue. [Citation omitted.]" 6 F. Supp. 2d at 1273. In *Altrutech, Inc.*, the court found that Illinois bore a reasonable relation to the agreements between the parties and, therefore, held that Illinois contract law would govern as specified by the parties in the agreements. 6 F. Supp. 2d at 1273.

Oppenheimer also cites *Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 810 P.2d 1154 (1991), as authority for the proposition that the reasonable relation test of the Restatement (Second) should apply here. In *Cates*, this court reviewed the validity of a choice of law clause applying Missouri law to a mortgage contract on Cates' home in Kansas. In support of their position, the Cates cited from the Restatement (Second) of Conflict of Laws § 187 (1969):

" '§ 187. Law of the State Chosen by the Parties.

'(1) *The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.*

'(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

'(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.' (Emphasis added.)" 248 Kan. at 705-06.

Neither *Altrutech, Inc.* nor *Cates* considered the public policy exception to Kansas choice of law rules. Therefore, neither case is dispositive.

Where the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement. In *Davis v. Miller*, 269 Kan. 732, 7 P.3d 1223 (2000), this court was presented with the issue of interpretation and enforcement of a postnuptial contract. There, the contractual agreement incorpo-

rated the legal requirements of the Kansas Uniform Premarital Agreement Act, even though that Act expressly excludes from its scope of coverage postnuptial agreements. After noting that both parties voluntarily signed the agreement with benefit of advice of counsel, we stated:

"Despite the legislative intent and the clear language of the KUPAA, parties can bind themselves to the provisions of an otherwise inapplicable act by incorporating choice of law provisions in an enforceable contract. As long as application of a statute or act is not contrary to public policy, a court will uphold application of an otherwise inapplicable statute or act." 269 Kan. at 739.

As we stated in *Davis*, however, a well-recognized exception to the general rule allowing parties to incorporate their choice of law into the contract does exist. Where the application of the contracting parties' choice of law provision engenders a result contrary to public policy, Kansas courts will not apply another state's law. Likewise, the New York courts have refused to enforce the law of a foreign jurisdiction if doing so would result in a violation of New York public policy. See *Haag v. Barnes*, 9 N.Y.2d 554, 560, 216 N.Y.S.2d 65, 175 N.E.2d 441 (1961).

In *Safeco Ins. Co. of America v. Allen*, 262 Kan. 811, 941 P.2d 1365 (1997), a case involving the interpretation of an insurance contract, this court stated:

"In *Baker*, the Court of Appeals correctly noted that where there is a conflict of laws, Kansas follows the general rule that the law of the state where the insurance contract is made controls. See 14 Kan. App. 2d at 644. In *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc.*, 245 Kan. 258, 270, 777 P.2d 1259 (1989), *cert. denied* 493 U.S. 1036 (1990), we observed that Kansas follows the *lex loci* rule, not the 'most significant relationship' rule set out in Restatement (Second) of Conflict of Laws § 188 (1969). We did, however, state that Kansas would not apply the law of another state if it violated Kansas public policy, and quoted the following from *Barbour v. Campbell*, 101 Kan. 616, 617, 168 Pac. 879 (1917):

' "Ordinarily a contract which is valid where made is valid everywhere, but there is a well-known exception to that rule. Briefly stated, the exception is that *where the contract contravenes the settled public policy of the state whose tribunal is invoked to enforce the contract, an action on that contract will not be entertained.*" ' 245 Kan. at 270." (Emphasis added.) 262 Kan. at 822.

If a choice of law provision is contrary to the public policy of the forum state, it will not be enforced by the court. Instead, the court will apply the *lex fori*, or law of the forum. " 'The general rule is that the law of the forum applies unless it is expressly shown that a different law governs, and in case of doubt, the law of the forum is preferred.' [Citation omitted.]" *Systems Design v. Kansas City P.O. Employees Cred. Union*, 14 Kan. App. 2d 266, 269, 788 P.2d 878 (1990).

Klein and Brenner contend that the protections of the Kansas Securities Act are to be given a broad application and, therefore, to ignore public policy by enforcing the contractual provision would contradict prior Kansas case law. While acknowledging that the issue of applying the public policy exception to the sale of securities is one of first impression in Kansas, Klein and Brenner cite the following cases in support of its application here: *Barbour v. Campbell*, 101 Kan. 616, 617, 168 Pac. 879 (1917); *Hartford Accident & Indem. Co. v. American Red Ball Transit Co.*, 262 Kan. 570, 938 P.2d 1281, *cert. denied* 522 U.S. 951 (1997); and *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc.*, 245 Kan. 258, 777 P.2d 1259 (1989), *cert. denied* 493 U.S. 1036 (1990).

The *Barbour* case arose after Willie Barbour, the divorced wife of Webster Barbour, filed suit in Kansas to enforce an oral promise unenforceable under the Kansas statute of frauds. According to Willie Barbour, Webster Barbour promised to pay her $500 to render nursing services to him during his last sickness, and Webster's daughter, Maude Campbell, agreed to pay Willie this amount in the event that Webster died. Willie was a resident of Boise, Idaho, and offered proof that Campbell's oral promise to pay her father's debt would be enforceable in Idaho under that state's statute of frauds. This court declared:

"Ordinarily a contract which is valid where made is valid everywhere, but there is a well-known exception to that rule. Briefly stated, the exception is that where the contract contravenes the settled public policy of the state whose tribunal is invoked to enforce the contract, an action on that contract will not be entertained. [Citations omitted.]" 101 Kan. at 617.

Thus, because this court found that the enforcement of an oral promise to pay $500 contravened the public policy of Kansas re-

flected in our statute of frauds, such a contract could not be enforced in the courts of Kansas. 101 Kan. 616, Syl. ¶ 1.

In *St. Paul Surplus Lines Ins. Co.*, Playtex appealed a trial court ruling in a declaratory judgment action holding that the public policy of Kansas precluded Playtex from recovering $10,000,000 from its excess insurers. The appeal involved the interpretation of an insurance contract and followed a products liability judgment of $10,000,000 in punitive damages assessed against Playtex. There, this court firmly indicated that once the decision is made to apply the public policy exception, there is no need for further conflict of laws analysis. 245 Kan. at 270.

"Certain states have now abandoned the *lex loci* rule in favor of the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws § 188 (1969). [Citations omitted.]

"We reserve consideration of the Restatement's 'most significant relationship' test for a later day. Our choice of Kansas law rests on Kansas public policy. The interest of Kansas exceeds Delaware's interest in the resolution of the instant controversy." 245 Kan. at 270.

Noting that "[t]he objective of the policy is to prevent wrongful acts against citizens of the State of Kansas," and that "the manufacturer could avoid the application of Kansas public policy where the manufacturer had contracted outside the State of Kansas . . . [resulting] in the uneven application of the public policy," this court affirmed the trial court's choice of Kansas law. 245 Kan. at 272-73.

*Hartford Accident & Indem. Co.*, 262 Kan. 570, also involved a declaratory judgment action regarding whether an insurer was obligated to indemnify its insured for punitive damages. Red Ball contended that Indiana law applied because the insurance policy was issued there and asserted that under the *lex loci* rule used by Kansas courts, the trial court erred in applying Kansas law to deny insurance coverage for punitive damages. We disagreed, stating:

"Here, two Kansas residents were fatally injured in an accident that occurred in Kansas. The argument that application of Indiana law is necessary to maintain a uniform interpretation of the insurance policy Red Ball contracted with Hartford finds support in the traditional notions underlying the *lex loci* rule. However, the interest of Kansas exceeds Indiana's interest in the resolution of the instant controversy. [Citation omitted.]" 262 Kan. at 575.

Although none of the cases mentioned above specifically apply the public policy exception to the sale of unregistered securities in Kansas, they instruct us that where a strong public policy exists for the prevention of wrongful acts against citizens of the State of Kansas, this court will apply the *lex fori*, or law of the forum. This leads us to the question of the strength of Kansas public policy in the area of securities regulation.

"Before courts are justified in declaring the existence of public policy, ' "it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt." ' " *Riddle v. Wal-Mart Stores, Inc.*, 27 Kan. App. 2d 79, 86, 998 P.2d 114 (2000) (quoting *Palmer v. Brown*, 242 Kan. 893, 897, 752 P.2d 687 [1988]).

Kansas securities statutes make it "unlawful for any person to offer or sell any security in this state" unless such security is registered or fits one of the categories of exempt securities. K.S.A. 17-1255. It is well settled in this state that "[t]he purpose of the Kansas Securities Act (K.S.A. 17-1252 *et seq.*) is to place the traffic of promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors, thereby preventing, so far as possible, the sale of fraudulent and worthless speculative securities." *Activator Supply Co. v. Wurth*, 239 Kan. 610, Syl. ¶ 1, 722 P.2d 1081 (1986).

It seems clear to this court that a strong public policy in favor of rigid governmental regulation of the sale of securities and the protection of investors exists and has been thoroughly established in both statutory and case law. Other states have so held.

Other states' courts interpreting either identical or similar securities laws to those of Kansas have concluded that state public policy and nonwaiver provisions of state securities law required the disregard of contract provisions specifying the application of another state's law.

This court has previously stated:

"The Kansas Securities Act is patterned after the Uniform Securities Act which is itself a copy of the Federal Securities Act of 1933. As a part of the web of the Uniform Acts throughout the nation and because of the common history and theories behind both the state and federal experience in the field of securities

regulation, the Kansas Act should be developed by court decisions which are firmly grounded on prior state decisions and upon prior decisions of the federal courts, and the courts of our sister states." *State ex rel. Owens v. Colby*, 231 Kan. 498, 501, 646 P.2d 1071 (1982).

Klein and Brenner advance the following cases: *Boehnen v. Walston & Co., Inc.*, 358 F. Supp. 537 (D. S.D. 1973); *Getter v. R. G. Dickinson & Co.*, 366 F. Supp. 559 (S.D. Iowa 1973); *Hall v. Superior Court*, 150 Cal. App. 3d 411, 197 Cal. Rptr. 757 (1983); *Ito Corp. v. Prescott, Inc.*, 83 Wash. App. 282, 921 P.2d 566 (1996); and *Hossain v. Rauscher Pierce Refsnes, Inc.*, 46 F. Supp. 2d 1164 (D. Kan. 1999).

In *Boehnen*, Lloyd Boehnen filed suit in the United States District Court for the District of South Dakota alleging common-law fraud, violations of the federal Securities and Exchange Act, and violations of South Dakota Blue Sky Laws. Boehnen moved for summary judgment on his claim that the defendant Walston & Co., a national securities dealer, had sold stocks to him that were not registered as required by the South Dakota Blue Sky Laws.

Just as in this case, Boehnen completed a customer agreement form that the defendant sent him which stated: "18. The provisions of this agreement shall in all respects be construed according to, and the rights and liabilities of the parties hereto shall in all respects be governed by, the laws of the State of New York." 358 F. Supp. at 540. The court found that the crux of the issue was whether South Dakota law was applicable.

In concluding that New York law did not govern, the *Boehnen* court turned to persuasive authority and stated:

"Thus a stipulation by which the parties select the law to govern the contract is valid and will be given effect only if it is not contrary to public policy generally, or to the public policy of the forum, . . ., or in violation of a statute of the forum enacted for the protection of its citizens, . . . . 16 Am. Jur. 2d Conflicts of Laws Sec. 46 (1964). The purpose of the South Dakota Blue Sky Laws it to protect the public. [Citation omitted.] To permit the choice of law stipulation in question to control the determination of whether or not South Dakota law will apply, would be to provide an effective means of circumventing legislation designed to protect the citizens of South Dakota. This would clearly be against public policy." 358 F. Supp. at 540-41.

In *Getter*, plaintiffs brought suit alleging that the defendant broker and its agents offered and sold unregistered securities to plaintiffs in violation of federal and Iowa state securities laws. There, defendants claimed that the Iowa Securities Act was not applicable due to a statement in the purchase agreement that New York law would apply. The contract provided: "This agreement is being executed and delivered and the shares and the options are being delivered in the State of New York, and this agreement shall be construed in accordance with, and governed by the laws of such State." 366 F. Supp. at 574-75.

The *Getter* court framed this issue as whether the contract provision was a valid waiver of plaintiffs' rights or remedies under the Iowa Securities Act. The court stated:

"Ordinarily, choice of laws provisions in contracts are valid except where they are contrary to State public policy. In the present case, we have a protective statute for purchasers of securities in the State of Iowa. This Court concludes as a matter of law that under the circumstances of this cause of action that the plaintiffs did not waive the protections of the Iowa Securities Act." 366 F. Supp. at 574-75.

Because the court found that the plaintiffs were asked to sign a contract waiving future possible remedies under Iowa's blue sky laws, the court held a choice of law provision such as this one was not enforceable, even in the absence of fraud, misrepresentation, or concealment. 366 F. Supp. at 375.

In *Hall*, the California Court of Appeals considered in a case of first impression whether a choice of law provision in a private securities agreement was enforceable. There, the limited partnership agreement provided it was to be governed by California law, but the subsequent stock transaction agreement (trading the interests of the limited partners for restricted shares of common stock in the general partner company) provided for the application of Nevada law and stipulated a Nevada forum. The agreement stated it was "deemed to have been made in and shall be governed by and enforced in accordance with the laws of the State of Nevada." 150 Cal. App. 3d at 414.

Looking to California Securities Law § 25701, a nonwaiver statute employing the same language found in K.S.A. 17-1268(d), the court stated:

"California's policy to protect securities investors, without more, would probably justify denial of enforcement of the choice of forum provision, although a failure to do so might not constitute an abuse of discretion; but section 25701, which renders void any provision purporting to waive or evade the Corporate Securities Law, removes that discretion and compels denial of enforcement.
. . . .

"Similarly, we believe the right of a buyer of securities in California to have California law and its concomitant nuances apply to any future dispute arising out of the transaction is a 'provision' within the meaning of section 25701 which cannot be waived or evaded by stipulation of the parties to a securities transaction. Consequently, we hold the choice of Nevada law provision in this agreement violates section 25701 and the public policy of this state [citation omitted] and for that reason deny enforcement of the forum selection clause as unreasonable." 150 Cal. App. 3d at. 418.

Thus, the California Court of Appeals held that the nonwaiver statutory language and public policy of California prevented enforcement of the choice of law provision.

In *Hossain*, an investor sued the clearing broker following the insolvency of the introducing broker to recover deposited funds. There, the introducing broker, Primeline Securities Corp., had entered a clearing agreement with the defendant clearing broker (RPR). The clearing agreement contained a choice of law provision stating that the "agreement shall be governed by and construed in accordance with the laws applicable to contracts made and to be performed within the State of New York." 46 F. Supp. 2d at 1167. Plaintiff Hossain sent checks totaling $151,000 payable to RPR to Primeline, who directed RPR to deposit the checks in an account for Nasir Siddiqui and Mohammad Hossaria. Primeline was thus able to convert Hossain's funds to its own use and benefit. It was not until Primeline was in bankruptcy that Hossain discovered the loss of his funds.

Hossain filed suit alleging that, as the third-party beneficiary of the clearing agreement, RPR was liable to him for damages resulting from the breach of its contractual obligation. RPR's position was that Kansas would not recognize a third-party beneficiary claim against a clearing broker, and even if such a claim were cognizable, a provision in the clearing agreement precluded third-party beneficiary claims.

Citing the authority of *Keith v. Schiefen-Stockham Insurance Agency, Inc.*, 209 Kan. 537, 498 P.2d 265 (1972), the *Hossain* court found that Kansas law would recognize a third-party beneficiary claim arising from the clearing broker-introducing broker relationship. In addition, the court noted that the strict internal and external regulations imposed a duty on clearing brokers to take measures to safeguard customer funds. The existence of this duty led the court to classify the relationship that existed between RPR and Hossain as a fiduciary relationship. Looking to the clearing agreement, the court next considered whether the provision there disallowed plaintiff Hossain's third-party beneficiary and fiduciary claims. The court stated:

"A clearing agreement which disavows the intent to create third-party beneficiaries is nearly nonsensical. An investor must be a beneficiary of a clearing agreement between the introducing broker and clearing broker. Without the intent to benefit the investor, there would be no need for the clearing agreement. As a matter of public policy, this clause renouncing any intent to benefit third parties must fail. *A clearing broker cannot contract away duties owed to an investor which the law requires him to perform. Contracts that are contrary to law and public policy are void and unenforceable.* [Citation omitted.]" (Emphasis added.) 46 F. Supp. 2d at 1168.

A 1999 law review article notes that clearing brokers are effectively immune from liability for clearing the trades of introducing brokers who are committing fraud and argues in favor of expanding clearing brokers' liability for the wrongdoing of introducing brokers. See Note, *Bar Baron at the Gate: An Argument for Expanding the Liability of Securities Clearing Brokers for the Fraud of Introducing Brokers*, 74 N.Y.U. L. Rev. 1014 (1999). Clearing securities trades for introducing brokers is a highly profitable business for the clearing broker. 74 N.Y.U. L. Rev. at 1019. Moreover, the author states that the 1982 amendments to New York Stock Exchange rules permit "clearing brokers to take on all of the mechanics of trading while avoiding responsibility for monitoring customers' accounts." 74 N.Y.U. L. Rev. at 1020-21.

"The effect of these rule changes has been to make it extremely difficult for an investor to hold the clearing broker liable if the introducing broker commits fraud, mismanagement, or some other actionable behavior. Because clearing agreements normally stipulate that the introducing broker is responsible for monitoring the

investor's account, and the investors themselves must agree to this arrangement, investors are hard-pressed to claim that the clearing broker had a duty to monitor their accounts. Clearing brokers are thus able to contract out of liability. Since 1982, the courts, with rare exceptions, have held clearing brokers liable only upon a showing that they effectively controlled the daily activities of the introducing broker. The 1982 rule changes have also caused an explosion in the number of introducing brokers in the securities industry. Given that the introducing brokers are often judgment proof (unlike the 'deep pocket' clearing brokerage firms), defrauded customers are often left with no legal recourse." 74 N.Y.U. L. Rev. at 1021-22.

In *Hunter v. American Rentals*, 189 Kan. 615, 618, 371 P.2d 131 (1962), this court considered whether American Rentals could avoid liability for negligence based on language contained in a contractual agreement between the parties. The *Hunter* court held that the contract was void and unenforceable, noting:

"Contracts for exemption for liability from negligence are not favored by the law. . . . The rule against such contracts is frequently limited to the principle that parties cannot stipulate for the protection against liability for negligence in the performance of a legal duty or a duty of public service, or where the public interest is involved or a public duty owed, or when the duty owed is a private one where public interest requires the performance thereof. (17 C.J.S., Contracts, § 262; 12 Am. Jur., Contracts, § 183.) . . . It is, of course, clear that a person cannot, by agreement, relieve himself from a duty which he owed to the public, independent of the agreement. [Citation omitted.]

. . . .

" . . . If an agreement binds the parties, or either of them, to do something opposed to the public policy of the state, it is illegal and absolutely void. [Citation omitted.] An agreement is against public policy if it is injurious to the interests of ' the public, contravenes some established interest of society, violates some public statute, or tends to interfere with the public welfare or safety." 189 Kan. at 617-18.

It would seem specious to hold that Kansas public policy demands payment of punitive damages by a tortfeasor without recourse to insurance funds, see *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc.*, 245 Kan. 258, 777 P.2d 1259 (1989), yet to allow a contractual choice of law provision to negate blue sky laws enacted to place the sale of securities under rigid regulation. Because Kansas' public policy strongly favors the regulation of securities transactions for the protection of Kansas investors, we hold the choice of law provision to be invalid on public policy

grounds. Thus, we overturn the district court's decision and hold the choice of law provision in Oppenheimer's standard form agreement invalid.

Klein and Brenner contend that, in its alternative ruling, the district court correctly determined that if Kansas law applied, Oppenheimer would be liable for damages.

The district court stated: "Although the Court has ruled that New York law, rather than Kansas law, is applicable, the Court will briefly address Oppenheimer's liability under Kansas law in the event that the appellate court finds that Kansas law should be applied." The court ruled that, under the rationale in *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 811 P.2d 1220 (1991), it appeared that under Kansas law, Oppenheimer would be liable for the sale of unregistered securities to Klein and Brenner.

Klein and Brenner classify the district court's additional analysis of Kansas law as a ruling in the alternative. Oppenheimer, however, characterizes this portion of the district court's opinion as dicta. Klein and Brenner assert that since Oppenheimer failed to file a cross-appeal of this ruling as required under K.S.A. 2001 Supp. 60-2103(h), Oppenheimer cannot challenge the district court's ruling on the effect of Kansas law.

We agree with the characterization of this part of the opinion as *obiter dictum*. The district court employed language indicating its opinion was conditioned on "the appellate court [finding] that Kansas law should be applied" and stated "it does *appear* that Oppenheimer would be liable." (Emphasis added.) The court additionally noted that because a factual dispute as to the amount of damages remained, even if Kansas law applied, it would be inappropriate to grant summary judgment to Klein and Brenner. For all these reasons, we decline to comment further on the extent of Oppenheimer's liability under Kansas law and remand the matter to the district court for further proceedings consistent with this opinion.

Reversed and remanded.