NOT DESIGNATED FOR PUBLICATION

No. 127,653

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SOFTSERVE, INC.,
*Appellant*,

v.

NETSMART TECHNOLOGIES, INC.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; ROBERT J. WONNELL, judge. Oral argument held October 29, 2024. Opinion filed November 15, 2024. Affirmed in part, reversed in part, and remanded.

*Michael T. Raupp, Kirsten A. Byrd,* and *Emily B. Waters*, of Husch Blackwell, LLP, of Kansas City, Missouri, and *William P. Kealey*, pro hac vice, of Stuart & Branigin LLP, of Lafayette, Indiana, for appellant.

*Patrick N. Fanning* and *Emma C. Halling*, of Lathrop GPM LLP, of Kansas City, Missouri, for appellee.

Before CLINE, P.J., MALONE and SCHROEDER, JJ.

PER CURIAM: Netsmart Technologies, Inc., and SoftServe, Inc., had a long-term contractual relationship governed by a Master Services Agreement (MSA), under which SoftServe provided Netsmart software and development services. In January 2022, the parties executed a year-long ancillary agreement, titled Statement of Work #7 (SOW #7) to govern SoftServe's provision of a team of remote workers—many of whom would be located in Ukraine—to continue these services. Unfortunately, about a month after SOW

1

#7 was executed, Russia invaded Ukraine. In response to the war, Netsmart revoked network access to SoftServe's Ukraine-based workers due to the threat of cyberattacks and sent SoftServe a letter explaining that it was invoking the force majeure clause included in their MSA and providing a 90-day notice of termination of the MSA. SoftServe disagreed with Netsmart's position that the war in Ukraine constituted a force majeure event and treated Netsmart's letter as a without-cause, early termination of SOW #7. Unlike the termination provision in the MSA, SOW #7's termination required only one months' notice, but it required the payment of an early termination fee. One month after Netsmart sent its letter invoking force majeure and providing 90 days' notice of termination under the MSA, SoftServe sent an invoice seeking payment of the early termination fee under SOW #7. When Netsmart refused to pay that invoice, insisting that it had not terminated their contract under SOW #7 and that the force majeure clause prevented it from incurring any liability for its nonperformance, SoftServe filed a petition alleging breach of contract based on Netsmart's nonpayment of the early termination fee. Following discovery, the parties filed competing motions for summary judgment.

The district court granted summary judgment in Netsmart's favor and denied SoftServe's motion, finding that Netsmart had appropriately invoked force majeure due to the war in Ukraine, that SOW #7's termination provision did not apply because any termination was not "without cause," and that SOW #7 had expired while the force majeure event was still ongoing. On appeal, SoftServe argues: (1) The district court erred in granting summary judgment to Netsmart because the provisions of SOW #7, not the MSA, controlled the termination of the contract; (2) the district court misconstrued and misapplied the force majeure clause in finding for Netsmart; and (3) the district court erred by resolving factual disputes in favor of Netsmart in granting its motion for summary judgment. After thoroughly reviewing the record, we affirm the district court's denial of SoftServe's motion for summary judgment but reverse its decision to grant summary judgment to Netsmart and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Netsmart is a healthcare software company that provides electronic health record technologies to thousands of healthcare providers across the United States. On October 3, 2016, Netsmart entered into an agreement with SoftServe, another technology company that offers software and development services, under which SoftServe would provide a range of software development, coding, and maintenance services for Netsmart's home care software platform. The parties set forth their business arrangement in an MSA. As part of the MSA, SoftServe agreed that the specifications for particular projects for Netsmart would be summarized in separate SOW agreements for specific projects.

The parties executed SOWs over each of the following years, the seventh of which (SOW #7) was executed on January 24, 2022. SOW #7 was scheduled to cover SoftServe's provision of remote engineering support for Netsmart's "Homecare product line" from Ukraine, Poland, Bulgaria, and the United States for the entirety of 2022. Under SOW #7's, "Description of Deliverables," SoftServe's remote engineering team would provide "product design, development, enhancements, bug fixing and quality assurance." To perform this role, SoftServe's remote engineers would be given access to Netsmart's technical and service support cases and tickets, intellectual property, software systems, and data repositories where Netsmart keeps a multitude of confidential and private client data and information.

SOW #7 was "made pursuant to" and "subject to" the terms of the MSA, but it also states that "[i]n the event of any conflict between this SOW and [MSA], the SOW will prevail, solely to the extent of that inconsistency." It also set forth the size of SoftServe's engineering team, the approximate number of hours they would work for Netsmart per month, a schedule of rates for the work, and a "maximum authorized payment."

Both the MSA and SOW #7 contained termination clauses. In Section 5, titled, "Term and Termination," the MSA provides:

"(a) <u>Term</u>. This Agreement will become effective as of the Effective Date and will remain in effect for twelve (12) months period or until terminated as provided herein ('Term'). At the end of the current Term of this Agreement the Term shall automatically continue for additional term of twelve (12) months unless either Party gives the other written notice thirty (30) days prior to end of the then current Term of its intention to terminate this Agreement.

"(b) <u>Termination</u>.

"(i) *Either Party may terminate this Agreement by providing the other Party with at least ninety (90) days written notice.*

"(ii) Either Party may terminate this Agreement, immediately upon notice to the other Party, if the other Party breaches any material obligation under this Agreement, and such Party fails to cure the breach to the notifying Party's satisfaction within thirty (30) days after written notice to cure.

. . . .

"(c) <u>Effect of Termination</u>. Upon such termination all rights and duties of the Parties toward each other shall cease except that [Netsmart] shall be oblig[at]ed to pay, within thirty (30) days of the effective date of termination, all undisputed amounts owing to SOFTSERVE for Services completed prior to the termination date in accordance with the provisions of Section 1 and 3 hereof. . . ." (Emphasis added.)

The termination provisions in SOW #7, Sections 11.1 and 11.2, address both for-cause and without-cause situations. These provisions stated:

"11.1. Either Party may terminate this SOW, immediately upon notice to the other Party for cause, if the other Party breaches any material obligation under this SOW, and such Party fails to cure the breach to the notifying Party's satisfaction within thirty (30) days after written notice to cure. Client will not pay SoftServe any termination fees if termination is for cause.

4

"11.2. Client may terminate this SOW without cause, by providing SoftServe with at least one month written advance notice. Such termination can take place for complete calendar month only. If Client decides to terminate this SOW without cause, Client shall pay SoftServe an early termination charge in the amount equal to three months and half of the highest monthly billing during the term of this SOW."

Relevant to this case, the MSA also contained a force majeure clause, Section 16, which stated:

"No liability shall result from the non-performance of any obligation under this Agreement caused by circumstances beyond the control of the non-performing Party including, without limitation, natural catastrophes, extreme weather conditions, fire, war, strikes, hostilities, acts of terrorism, civil unrest, governmental interference, and embargoes (collectively, 'Force Majeure') for that period commencing from the time at which notice of the existence of the Force Majeure is given by the non-performing Party and terminating when the Force Majeure has ended or would have ended had the non-performing Party taken those steps which it could reasonably have been expected to take to overcome the Force Majeure provided it could be overcome. The Force Majeure shall automatically extend the period for performing the obligation under this Agreement of the non-performing Party. If a Force Majeure continues for more than 3 (three) months, either Party may terminate this Agreement as to the SOW relating to the software development not yet delivered."

In Section 15, the MSA set forth Netsmart's obligation to provide certain access to SoftServe, so that its employees could perform the software development and maintenance services:

"CLIENT acknowledges that the completion of various parts of the Deliverables under this Agreement, SOW, Change Order, etc. may depend on and require CLIENT's commitment of certain resources. CLIENT agrees to provide such resources and to timely complete and fulfill its required actions in order for SOFTSERVE to be able to fully comply with its obligations under this Agreement. CLIENT's failure to provide such

5

resources and to timely fulfill such obligations shall not constitute a basis for the retention of payments and/or allegations of breach of contract by SOFTSERVE."

Finally, the MSA also provided in Section 17, "Limitation of Liability":

"Under no circumstances shall either party have any liability for any claim arising from or relating to this Agreement in excess of the amount paid to SOFTSERVE by CLIENT under specific SOW from which liability is claimed to have arisen. The amount paid does not pertain to those Deliverables that have been accepted and approved by CLIENT. Neither Party hereto shall have any liability for consequential, incidental, special, or indirect damages (including, without limitation, loss of profit and business opportunities) regardless of whether the Party has been advised, or is aware, of the possibility of such damages. Each Party acknowledges that the foregoing limitations are an essential element of the Agreement between the Parties and that in the absence of such limitations the pricing and other terms set forth in this Agreement would be substantially different."

On January 25, 2022 (the day after Netsmart signed SOW #7), due to escalating hostilities between Ukraine and Russia, SoftServe presented a "Business Continuity Plan" in which it outlined different scenarios that might affect its work in Ukraine. As part of the Business Continuity Plan, SoftServe noted that its employees in Ukraine were located away from the current conflict but stated that, depending on how the situation developed, relocation of its Ukraine-based workers could become a necessity. That said, SoftServe assured Netsmart that its IT infrastructure had no dependency on physical location, that 90% of its team was eligible to relocate, and that it had "capacity to accommodate the relocated teams timely."

On February 23, 2022, SoftServe updated Netsmart on the situation as hostilities between Ukraine and Russia intensified:

"On February 21, 2022, the Russian Federation recognized the so-called 'Donetsk and Luhansk People's Republics' as 'independent' and legalized the usage of military troops outside of Russia. Currently there are no Russian military movements outside of territories occupied since 2014.

"Today, on February 23, 2022, the Ukrainian government announced a state of national emergency within the whole country. Along with the growing threat of a Russian invasion, the Ukrainian government also started the process of mobilization of Ukrainian military reservists, but this is not ordering full mobilization. It will have no or very limited impact on SoftServe's associates located in Ukraine.

"Netsmart team at SoftServe *is not impacted* by mobilization since, there are no military reservists in the team.

"SoftServe has established means of support to it['s] associates such as an emergency hotline to grant effective communication in current circumstances. Our initiatives also include support with relocation for all associates who are willing to move to more secure parts of the country/abroad. On this matter, we provide both psychological and financial support for them and their spouse/partner and children as requested.

"The SoftServe is still on the emergency level 0, we are operating at 100%.

"We will relocate team members from Odessa and Kremenchuk in case we will move to the emergency level 1. Also, we will double check with them if they are willing to be relocated right now.

"Regarding the options for remotely disabl[ing] access and purg[ing] machine data. All our employees have SoftServe security tools installed on their laptops. Thus, there is full control of them and ability to do it remotely." (Emphasis added.)

On February 24, 2022, Russia began a full-scale invasion of Ukraine. SoftServe informed Netsmart that because of the invasion, it was "activating the emergency Phase

7

2" of the Business Continuity Plan, and that relocation of its employees to Western Ukraine was in progress, leaving some of its engineers temporarily offline.

Four days after Russia's invasion began, on February 28, 2022, Netsmart sent the following letter to SoftServe:

"In accordance with and effective as of our conversation Monday, February 28, 2022, Netsmart Technologies, Inc. has invoked Section 16 (Force Majeure) of the Master Services Agreement due to the force majeure events affecting Ukraine. Specifically, the force majeure events in Ukraine have been the cause of Netsmart not performing its obligations set forth in Section 15 of the Master Services Agreement because those events have created a significant and intolerable security risk of providing access to its electronic systems to contractors based in Ukraine.

"In the event payment is or becomes due on or after February 28, 2022, Netsmart will pay Vendor for those deliverables completed and/or services performed prior February 28, 2022 in accordance with our mutually executed contract.

"As the situation involving Ukraine and Russia develops and new information and guidance from authorities becomes available, Netsmart will continue to stay abreast of the situation and how it affects our business relationships with our vendors. The goal for Netsmart is to resume business-as-usual as soon as any force majeure events end. Netsmart will send a separate written correspondence at that time.

"Netsmart is also hereby providing notice of termination of the Master Services Agreement pursuant to Section 5(b)(i)."

On the same day Netsmart sent this letter, it also suspended access to its system to SoftServe's Ukraine-based team members—that said, it maintained access for SoftServe's one Poland based team member.

On March 8, 2022, SoftServe replied to Netsmart's letter, contesting its assertion that the conflict in Ukraine was a force majeure event justifying Netsmart's withdrawal of access to its system. SoftServe argued that it had mitigated the risk of cyberattacks and stated that "[a] perceived risk is a conjecture of a force majeure, not an actual force majeure interruption." SoftServe also maintained that Netsmart could not rely on the MSA's termination provision and that—if Netsmart intended to terminate—the proper contractual vehicle to do so was SOW #7's without-cause provision.

Netsmart responded on March 14, 2022, reiterating its belief that the war in Ukraine constituted a force majeure event:

> "Russian military activities and occupation of Ukraine pose very real and materialized threats to the security of our systems and intellectual property, especially where it is well-documented that Russia engages in state sponsored cyber-terrorism and hacking. . . . [T]he current state of affairs in Ukraine constitutes a substantial and significant risk, not simply a perceived risk, of unauthorized access to our systems in the U.S. from Ukraine. The cybersecurity risk is real, substantial, and one that Netsmart is not willing to take by continuing to provide access to our systems from a war zone.

> "The circumstances of war in Ukraine are beyond our control and under Section 16 of the MSA, no liability shall be incurred as a result of our non-performance of providing access. We have considered mitigating risks (and will continue to do so), but so far we have not come up with any sufficient means of mitigating this risk other than to shut off access to our systems."

Netsmart also explained its belief that the force majeure provision in the MSA permitted termination of their contract if the force majeure continued for more than three months. And it also dismissed SoftServe's assertion that it was required to terminate their contract under SOW #7 Section 11.2, insisting that it had invoked the without-cause, 90-day notice termination provision contained in Section 5(b)(i) of the MSA instead. Despite

the talk of termination, Netsmart concluded: "We look forward to . . . discussing alternative and viable solutions you may have. We too value the partnership and would like to continue the relationship provided we can find mitigation strategies that address the aforementioned risks to our business affairs."

The next day, the parties met to discuss their relationship. During that meeting, SoftServe again accused Netsmart of wanting to terminate their contract and of using the war in Ukraine as an excuse to do so. Netsmart disagreed and asked for alternative solutions outside of continuing to rely on workers inside Ukraine.

About a week later, SoftServe met with Netsmart again and proposed a "Second Business Continuity Plan," under which SoftServe would transition its work for Netsmart out of Ukraine and into Latin America—the plan outlined a timeline of about 9 to 12 months to complete the transition of SoftServe's employees out of Ukraine. On top of that delay, SoftServe's plan was estimated to be nearly twice as expensive as the original maximum authorized payment for Netsmart, who ultimately rejected the proposal.

On March 28, 2022, exactly one month after Netsmart sent its initial letter invoking the force majeure clause, SoftServe sent Netsmart a termination invoice in the amount of $523,849.90, based on its position that the without-cause termination provision in SOW #7—and its early termination penalty—applied to Netsmart's actions. SoftServe explained: "'In response to Netsmart official letters from Feb 28, March 14 and March 28, we perceive the termination of [SOW #7] under section 11.2 as termination for convenience due to absence of any breach or other evidence[] that could trigger termination option.'"

Netsmart responded to SoftServe's termination invoice on April 6, 2022, reiterating its position that the war in Ukraine was a force majeure event justifying its

nonperformance, i.e., its decision to withdraw system access to SoftServe's Ukraine-based employees: "This war, a force majeure event, has been the cause of Netsmart not performing its obligations set forth in Section 15 of the Master Services Agreement because those events have created a significant and intolerable security risk of providing access to its electronic systems to contractors based in Ukraine." Netsmart also stated:

> "Netsmart continues to monitor the force majeure per Section 16 of the MSA. Should force majeure continue for three months after February 24, 2022, Netsmart would be terminating under Section 16. We also provided notice of termination of the Master Services Agreement pursuant to Section 5(b)(i) . . . . To be clear, we have never sent any notice of termination invoking Section 11.2 of [SOW #7], and so it has not been triggered and does not apply."

*Proceedings in district court*

On July 13, 2022, after the parties failed to reach an agreement, SoftServe filed a complaint in Johnson County District Court, alleging Netsmart breached their contract by failing to pay the early termination fee under SOW #7's without-cause termination clause. SoftServe's petition demanded the payment of the early termination fee of $523,849.90 plus attorney fees as provided in the MSA. Netsmart answered the petition raising affirmative defenses under the MSA's force majeure clause and also requested attorney fees. Both parties demanded a jury trial on the breach of contract claim.

The district court entered a detailed case management order controlling discovery and dispositive motions. The parties also entered an agreed protective order regarding confidentiality of discovery materials.

Following discovery, SoftServe moved for summary judgment on its breach of contract claim. That same day, Netsmart filed a competing motion for summary

11

judgment, arguing it was not subject to any liability under SOW #7 because it had appropriately invoked the force majeure clause of the MSA in terminating its business relationship with SoftServe. The parties filed responses and replies to each motion.

In its motion, SoftServe alleged that Netsmart intended to terminate their agreement with its February 28, 2022 letter, and the only means it could contractually do so was under SOW #7's without-cause termination provision. SoftServe noted that a termination under that clause required Netsmart to "'pay SoftServe an early termination charge in the amount equal to three months and a half of the highest monthly billing during the term of this SOW.'" Because Netsmart refused to pay the invoice for the contractually specified amount, SoftServe contended Netsmart had breached the contract.

SoftServe also asserted that Netsmart's invocation of the force majeure clause did "not map up to Netsmart's termination decision and actions. Citing cybersecurity fears, Netsmart made the internal decision to lock out SoftServe from performing the work that Netsmart had just commissioned. The parties' contract does not provide a for-cause termination option based on Netsmart's cybersecurity rationale."

SoftServe argued that Netsmart was "aware of Russian aggression on Ukraine soil since 2014" and the parties had been doing business together despite those aggressions throughout that time, which included years of Russian occupation of parts of Ukraine. In other words, SoftServe's position was that any Russia-related cybersecurity risks posed by the war in Ukraine were not sufficient to trigger the force majeure clause. SoftServe not only contended that Netsmart had not properly invoked the force majeure clause, but also that it could not rely on it to terminate their contracts because termination under the force majeure clause could only occur after the force majeure event continued for three months. SoftServe also argued that Netsmart did not implement the termination clause

12

contained in Section 5 of the MSA because its letter did not "purport[] to give ninety days written notice [of termination.]"

In its motion, Netsmart argued that it had properly invoked its right to suspend contractual performance under the force majeure clause because it had to protect its clients' confidential information and clinical records and its own intellectual property, thus precluding SoftServe's attempt to collect the early termination fee. It argued:

> "The force majeure clause does not require Netsmart to take a 'wait and see' approach to determine if the party who is attempting to perform services from within the country engaged in a war thinks it may still be able to perform notwithstanding the open hostilities and the tremendous casualties. In any event, the plain language of the parties' contract allowed Netsmart to decide for itself whether it was appropriate or tenable for Netsmart to risk a potential threat to client/patient information or its business assets following the outbreak of war. SoftServe cannot recover damages when Netsmart properly exercised its contract right after deciding it had no interest in cavalierly exposing its HIPAA-protected patient clinical information and proprietary electronic health record (EHR) software to the hazards of a war zone."

In short, Netsmart contended that so long as the district court found that the war in Ukraine constituted a force majeure event, it was within its legal rights to cease performance and ultimately terminate the contract and was under no obligation to pay the early termination fee under SOW #7's without-cause termination provision. That is, Netsmart argued that it did not breach the contract because it was permitted to halt its performance of contractual obligations until after the end of the Ukraine war—as part of this argument it contended that its decision to terminate the contract only became effective as of May 2022, three months after the force majeure event began. Similarly, Netsmart claimed that its notice of termination letter—which specifically cited the termination provision of the MSA—did not operate as a termination at that time but served as notice of termination in 90 days.

13

The district court held a hearing on the cross-motions for summary judgment on September 11, 2023. At the conclusion of that hearing, the district court announced that it was granting Netsmart's motion for summary judgment and denying SoftServe's motion. The district court added that it was "adopt[ing] all of [Netsmart's] uncontroverted paragraphs as statements of fact." The district court clarified there would be no final judgment until after it ruled on Netsmart's attorney fee request, and the journal entry would constitute the district court's final judgment.

On February 21, 2024, the district court entered its order, granting Netsmart's motion and denying SoftServe's motion. Highly summarized, the district court concluded that Netsmart properly invoked the force majeure clause because of the war in Ukraine and that force majeure continued on through the termination date of SOW #7. The district court reasoned that it need not delve into Netsmart's psyche to determine its motivation for deciding whether to invoke force majeure "because the clear language of the force majeure provision allows a party to invoke force majeure not only in the event of 'war' but also in the event of 'hostilities and civil unrest.'" That is, the district court found that the war in Ukraine constituted a force majeure event:

> "Under Section 16 of the MSA, no liability could result to Netsmart for invoking force majeure as long as the force majeure event continues. The force majeure provision may be viewed as a type of 'pause button' that postpones the parties' contractual performance until the force majeure event ends. Here, the force majeure events (war, hostilities, or civil unrest) continued through the December 31, 2022, termination date of SOW #7. Indeed, the force majeure event continues to this day. Accordingly, the three-month pre-termination period outlined in the force majeure provision of Section 16 to the MSA became a legal nullity on December 31, 2022, the date SOW #7 terminated."

The district court explained that undisputed facts showed that Netsmart's effective termination of the contract via the force majeure clause was thus a for-cause termination, and the provision of SOW #7 that SoftServe relied on in demanding an early termination

14

fee did not apply. In so ruling, the district court noted that the only way SoftServe could have prevailed on its motion was if Netsmart's termination had been without cause, but Netsmart's invocation of the force majeure clause precluded that outcome.

Alternatively, the district court found that Netsmart "exercised its right to terminate under Section 5 of the MSA [and therefore] had no obligation to pay any additional amount to SoftServe upon termination." The district court also concluded that Netsmart could not have owed additional money to SoftServe under SOW #7 because of the "Limitation of Liability" provision in Section 17 of the MSA, although it found this reason was "not a dispositive factor in the Court's decision." Finally, the district court awarded Netsmart, as the prevailing party, attorney fees and costs in the amount of $98,744.95 per the MSA. SoftServe timely appealed the district court's judgment.

DID THE DISTRICT COURT ERR IN GRANTING SUMMARY JUDGMENT TO NETSMART?

While SoftServe divides its appeal into three issues, they all fold into its central assertion that the district court erred in granting Netsmart's motion for summary judgment and in denying SoftServe's competing motion. First, SoftServe contends that the district court erred in granting summary judgment to Netsmart because the provisions of SOW #7, not the MSA, controlled Netsmart's termination of the contract. Second, it alleges that the district court misapplied the force majeure clause in finding for Netsmart. Third, SoftServe asserts that the district court erred by resolving factual disputes in favor of Netsmart in granting its motion for summary judgment.

Netsmart responds that the district court correctly found that it was entitled to summary judgment because it appropriately exercised its rights under the force majeure clause thereby excusing it from any performance under the MSA due to the war in Ukraine, which lasted past the expiration of SOW #7 and continues on to this day.

15

Alternatively, Netsmart argues that SoftServe was not entitled to summary judgment because there were disputed issues of material fact.

The parties included a choice of law provision in the MSA dictating that Delaware law would govern their agreement. And the parties agree that Delaware law applies to this court's resolution of the case. "'Under Kansas law, the enforceability of a contractual choice-of-law provision turns on whether the forum selected bears a reasonable relation to the contract at issue.'" *Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 538-39, 44 P.3d 364 (2002). Moreover, "[w]here the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement." 273 Kan. at 539. Netsmart is a Delaware corporation with its principal place of business in Kansas, and SoftServe is a Delaware corporation with its principal place of business in Florida. Thus, we agree with the parties that this court should apply Delaware law to the resolution of the parties' summary judgment motions based on the choice of law provision in their contract.

In Delaware, an appellate court reviews the granting or denial of a motion for summary judgment de novo. *Bathla v. 913 Market, LLC*, 200 A.3d 754, 759 (Del. 2018). "In doing so, the Court must 'determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law.'" 200 A.3d at 759. And because we look to the parties' contracts to settle the dispute, we also review questions of contract interpretation de novo. *GMG Capital Inv. v. Athenian Venture*, 36 A.3d 776, 779 (Del. 2012).

> "When interpreting a contract, the Court will give priority to the parties'
> intentions as reflected in the four corners of the agreement. 'In upholding the intentions of
> the parties, a court must construe the agreement as a whole, giving effect to all provisions
> therein.' The meaning inferred from a particular provision cannot control the meaning of

16

the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.

"The Court will interpret clear and unambiguous terms according to their ordinary meaning. 'Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.' 'A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.' Rather, an ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.' Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.' [Citations omitted.]" 36 A.3d at 779-80.

Here, neither party contends that the language of the MSA or SOW #7 is ambiguous, they merely disagree about which clause controls the outcome of the case (and whether the undisputed material facts entitle the other party to judgment as a matter of law). Thus, resolution of this appeal hinges on the interpretation of the force majeure clause in the MSA and the termination clauses in both the MSA and SOW #7. SoftServe contends that SOW #7's termination provisions control the outcome of the case, while Netsmart asserts that the MSA's force majeure clause is the determining provision.

*Termination provisions of SOW #7 and the MSA*

As noted above, the parties' applicable contracts encompass both the MSA, which set forth their general business arrangement, and SOW #7, which described the particular specifications of the projects SoftServe would perform for Netsmart in the calendar year 2022. Although SOW #7 was expressly made under the MSA, it provides that "[i]n the event of any conflict between this SOW and [MSA], the SOW will prevail, *solely to the extent of that inconsistency*." (Emphasis added.) Because both the MSA and SOW #7 have termination clauses, SoftServe argues the district court needed to apply the

17

"without-cause" termination provision in Section 11.2 of SOW #7, which required the early termination payment it seeks in this case.

SoftServe asserts that the termination provision in SOW #7 must control because its terms conflict with those of Section 5(b)(i) and the force majeure clause in the MSA. The obvious differences between Section 11.2 of SOW #7 and Section 5(b)(i) of the MSA are two-fold: (1) The MSA requires the terminating party to give 90 days' notice, while SOW #7 only requires one months' notice, and (2) SOW #7 mandates the payment of an early termination charge if the termination is without cause, while the MSA does not require any such payment. But there is another major difference that neither party addresses: SOW #7's termination provisions only permit the termination of SOW #7, not the MSA—it provides: "[Netsmart] may terminate *this SOW* without cause[.]" (Emphasis added.) On the other hand, Section 5(b)(i) of the MSA provides for the termination of the parties' overarching agreement, the MSA: "Either party may terminate *this Agreement*[.]" (Emphasis added.) As a result, the two clauses are not as directly in conflict as SoftServe asserts. While both are termination provisions, they apply to the termination of different contracts. In its February 28, 2022 letter, Netsmart indicated that it was providing *notice of termination of the MSA*, not SOW #7. Netsmart could not have relied on the termination provision of SOW #7 to terminate the MSA.

Although SoftServe begins its brief by discussing whether the outcome of this case is determined by application of the termination provision of Section 5(b)(i) of the MSA or Section 11.2 of the SOW #7, the district court took a different path. The district court began its ruling on the parties' summary judgment motions by looking to the force majeure clause, and whether it was sufficiently invoked by Netsmart to preclude SoftServe's breach of contract claim. After adopting all of the undisputed facts that Netsmart set forth in its motion, the district court found that Netsmart was entitled to judgment as a matter of law under the force majeure clause. The district court ruled that

18

SOW #7's without-cause termination provision did not apply because the parties' contracts were terminated as a result of the still ongoing force majeure event, which ultimately lasted longer than the contract term of SOW #7, and therefore operated as a for-cause reason for termination. SoftServe claims the district court's conclusion is riddled with errors of fact and law, while Netsmart maintains that the undisputed material facts show that it was entitled to judgment as a matter of law.

*The force majeure clause*

Force majeure clauses are included in contracts to protect parties from the consequences of adverse events beyond their control. As discussed above, Section 16 of the MSA, "Force Majeure" provides:

> "*No liability shall result from the non-performance of any obligation under this Agreement caused by circumstances beyond the control of the non-performing Party including, without limitation, . . . war, . . . hostilities, . . . civil unrest, . . . for that period commencing from the time at which notice of the existence of the Force Majeure is given* by the non-performing Party *and terminating when the Force Majeure has ended or* would have ended had the nonperforming Party taken those steps which it could reasonably have been expected to take to overcome the Force Majeure provided it could be overcome. *The Force Majeure shall automatically extend the period for performing the obligation under this Agreement of the non-performing Party. If a Force Majeure continues for more than 3 (three) months, either Party may terminate this Agreement as to the SOW relating to software development not yet delivered*." (Emphases added.)

Under its plain language, the force majeure clause permits a party to seek reprieve from liability for not performing contractual obligations when circumstances beyond that party's control—such as war, civil unrest, or hostilities—cause that party's non-performance. Notably, the force majeure clause's shield from liability includes "any obligation under this Agreement." Because SOW #7 was made under the MSA, the force

19

majeure clause—once properly invoked—thereby exempts the nonperforming party from any liability under it as well. To invoke this shield from liability, the nonperforming party must give notice of the existence of the force majeure, and once such notice is given, that shield remains in effect until either the force majeure event ends or would have ended had the nonperforming party taken steps to overcome it (if possible). And if the force majeure event continues for more than three months, either party is permitted to terminate their contract, as it relates to any work that has not yet been performed.

SoftServe contends that the district court erred in finding that Netsmart's invocation of the force majeure clause shielded it from liability to pay the early termination fee under SOW #7. The bulk of SoftServe's arguments on appeal are devoted to its assertion that the force majeure clause was not properly invoked, that the district court improperly construed the scope of the clause, and that the termination provision under the force majeure clause is inapplicable.

First, SoftServe argues that Netsmart's termination of the contract had nothing to do with the force majeure clause. This argument is premised on its repeated assertion that Netsmart terminated their contract when it sent the February 28, 2022 letter. Netsmart disagrees that the letter constituted a termination as of that date. As noted above, that letter informed SoftServe (1) that it was invoking the force majeure clause and suspending its performance under the contract due to the outbreak of war, and (2) that it was "providing notice of termination of the Master Services Agreement pursuant to Section (5)(b)(i) [of the MSA]." SoftServe contends that although Netsmart purportedly invoked the force majeure clause to excuse its nonperformance of future contractual obligations in the letter, Netsmart was actually terminating the parties' contractual relationship with the February 28, 2022 letter. According to SoftServe, had Netsmart just wanted to "wait and see" how the force majeure event played out to decide whether it

20

could later terminate the parties' agreement, there would have been no reason for Netsmart to cite the MSA's termination provision in its letter.

SoftServe correctly notes that the parties could only terminate the contract under the force majeure clause if the force majeure continued for three months after providing notice of the event. But SoftServe's argument that the contract was terminated on February 28, 2022, when the letter was sent, must fail because Section 5(b)(i) of the MSA, which Netsmart specified in its letter, also required 90 days' notice before a termination. Even Section 11.2 of SOW #7, which SoftServe claims Netsmart invoked with its letter, would not have permitted a termination without at least a months' notice.

Thus, Netsmart's February 28, 2022 letter did not immediately terminate the parties' contracts. On its face, Netsmart's letter notified SoftServe of three things: (1) It was invoking the force majeure clause to excuse any further performance of contractual obligations while the war in Ukraine continued; (2) it intended to resume the business relationship when/if the war in Ukraine ended; and (3) it was providing 90-day notice of termination of the MSA. The letter reflects that Netsmart did not want to terminate the SOW at that time: "The goal for Netsmart is to resume business-as-usual as soon as any force majeure events end. Netsmart will send a separate written correspondence at that time." Netsmart's actions following the letter, suspending access to SoftServe's Ukraine-based employees but maintaining access to the SoftServe team member who was in Poland, were inconsistent with a termination of the contract as of the date of the letter. Regardless of the contractual mechanism cited or Netsmart's alleged intent, it does not appear that the parties' contractual relationship was terminated as of February 28, 2022.

Next, SoftServe contends that the district court erred in granting summary judgment to Netsmart because it misinterpreted the force majeure clause. SoftServe argues that the district court incorrectly found that the force majeure clause acted as a

21

"'pause button' on the entirety of the contract" because "the clause's plain language explains that it operates only as a reprieve for a *nonperforming party*—providing that party with protection for failing to otherwise abide by a specific contractual obligation that is made impossible due to the *force majeure* event." Again, it appears that the focus of SoftServe's argument is that the force majeure clause could not terminate the contract at the moment that it was invoked. But that is not how the district court ruled that it applied. After finding Netsmart properly invoked force majeure, the district court added:

> "Under Section 16 of the MSA, no liability could result to Netsmart for invoking force majeure as long as the force majeure event continues. The force majeure provision may be viewed as a type of 'pause button' that postpones the parties' contractual performance until the force majeure event ends. Here, the force majeure events (war, hostilities, or civil unrest) continued through the December 31, 2022, termination date of SOW #7."

In other words, the district court found that Netsmart invoked the force majeure clause on February 28, 2022, to suspend its obligations to provide network access to SoftServe's Ukraine-based employees, and that reprieve from performance continued automatically until the force majeure ended. But the war continued beyond December 31, 2022, the date when SOW #7's one-year term expired.

SoftServe's argument that the district court "misconstrued this clause as halting *all* performance of *all* contractual obligations by *all* parties *upon the occurrence of a force majeure* event" is not an accurate summation of the court's ruling. (Emphasis added.) SoftServe appears to be arguing that Netsmart treated the force majeure clause as acting as a contract termination. But as SoftServe concedes, Netsmart invoked the force majeure clause to protect itself from liability for its nonperformance of its contractual obligation to provide SoftServe access to its systems which it was required to do under Section 15 of the MSA. And even after the war continued on for three months, Netsmart did not

exercise its right to terminate their contract under the force majeure clause. It merely sought to stop providing access to its network systems to workers in a warzone. In fact, a month after Netsmart sent the February 28, 2022 letter invoking the force majeure clause, SoftServe let go its sole team member located outside of Ukraine (who, unlike the employees in Ukraine, still had access to Netsmart's system) and sent Netsmart its termination invoice. In other words, at the time SoftServe attempted to collect the early termination fee, Netsmart still could not have invoked the termination portion of the force majeure clause. And by the time it could have done so, SoftServe was already acting as if the contract was canceled and was trying to collect the early termination fee.

SoftServe's argument that the district court misapplied the force majeure clause falls short because the provision's plain language permits a nonperforming party to avoid liability from the time it provides notice of the force majeure event until that event ends or could have ended with the exercise of reasonable steps, if possible. The district court's ruling—that "no liability could result to Netsmart for invoking force majeure as long as the force majeure event continues"—embraces that construction. Netsmart invoked the clause at the outset of the war, and the war was still ongoing long after SOW #7 expired. In this vein, the district court found that the force majeure provision's termination clause became a "legal nullity" on the date that SOW #7 ended, December 31, 2022. Because the force majeure event was still ongoing when SOW #7 expired, the contract was terminated without application of *any* termination provision.

To sum up so far, the termination provision in SOW #7 permits only the termination of SOW #7. The termination provision in the MSA provides for termination of the overarching MSA. The two provisions are not in direct conflict. Netsmart never sought to terminate SOW #7; it sought to relieve itself from liability under the MSA based on the force majeure clause. The force majeure clause shields a party from liability for "any obligation under this Agreement." Because SOW #7 was made under the MSA,

23

the force majeure clause—once properly invoked—exempts the nonperforming party from any liability under it as well. The district court did not err in considering the MSA and SOW #7 together and in interpreting the force majeure clause, particularly as to whether the clause could apply to this situation. That said, SoftServe argues this court should alternatively reverse the district court's ruling because it relied on disputed material facts in Netsmart's favor that the force majeure clause did apply to this situation.

*Disputed material facts*

Beyond its argument that the district court erred in interpreting the applicable contracts, SoftServe asserts that the district court improperly resolved material factual disputes in Netsmart's favor when it granted summary judgment to Netsmart. SoftServe argues that even if the district court were correct in ruling that the force majeure clause *could* apply, it erred when it ruled that it *did* apply at the summary judgment stage. SoftServe asserts two categories of material factual disputes: (1) whether Netsmart's inability to perform its contractual obligations was caused by the war in Ukraine, and (2) whether Netsmart could have taken reasonable steps to overcome the effect of the war.

In its ruling on the summary judgment motions, the district court recognized that "whether a party has breached a contract is normally a question for the jury[,]" but the court nevertheless concluded that this case was "ripe for summary judgment based on [its] interpretation of the four corners of the MSA and SOW #7." The district court explained that the only way SoftServe could prevail on its claim for breach of contract would be to establish that Netsmart's decision to terminate performance under the agreements was "without cause" under Section 11.2 of SOW #7. But the district court found that the undisputed facts confirmed that Netsmart's termination was not without cause. In reaching this conclusion, the district court found that the undisputed facts showed that Netsmart "properly and unequivocally invoked force majeure," that "the force majeure event continues to this day," and that "no liability could result to Netsmart

24

for invoking force majeure as long as the force majeure event continues." SoftServe argues that the district court's ruling involved "a whole host of predicate factual questions" that the court erroneously resolved in Netsmart's favor.

As noted above, in ruling on a motion for summary judgment, the court must determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has shown that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. *Bathla*, 200 A.3d at 759; see also *AeroGlobal Cap. Mgmt. v. Cirrus Industries*, 871 A.2d 428, 444 (Del. 2005) ("[I]f from the evidence produced there is a reasonable indication that a material fact is in dispute or if it appears desirable to inquire more thoroughly into the facts in order to clarify application of the law, summary judgment is not appropriate.").

While SoftServe agrees the war in Ukraine could qualify as a force majeure event, it asserts that the district court improperly resolved facts in Netsmart's favor to conclude that the war *caused* Netsmart's inability to perform its contractual obligations. The force majeure clause provides that "[n]o liability shall result from the non-performance of any obligation under this Agreement *caused* by circumstances beyond the control of the non-performing Party including, without limitation, natural catastrophes, extreme weather conditions, fire, war, strikes, hostilities, acts of terrorism, civil unrest, governmental interference, and embargoes (collectively, 'Force Majeure') . . . ." (Emphasis added.) Application of the force majeure clause requires not only the occurrence of a force majeure event, but also that the event causes a party's nonperformance.

As SoftServe notes, the district court's order includes no findings about whether the war in Ukraine caused Netsmart's inability to continue its performance under their contract. The district court's findings of fact—which consist of every uncontroverted factual statement that Netsmart set forth in its motion—outline a variety of

25

communications between the parties and displays several different IT security obligations and concerns that Netsmart needed to meet that presumably were impacted by Russia's invasion. But the record also contains internal communications between Netsmart employees suggesting that the company was responding to the generic risk of cyberattacks caused by the war, and that SoftServe employees believed that the dangers could be mitigated and that the parties could continue their relationship.

In its "Reply in Support of its Motion for Summary Judgment," SoftServe disputed this statement from Netsmart's "Supplemental Statement of Uncontroverted Facts":

> "Even though the force majeure event prevented Netsmart from providing electronic access to its systems in Ukraine, Netsmart nevertheless requested alternatives from SoftServe to allow SoftServe to provide the services to Netsmart outside of Ukraine."

SoftServe provided the following response:

> "The statement that 'the force majeure event prevented Netsmart from providing electronic access to its systems in Ukraine' is controverted both by Netsmart's factual allegations and by Netsmart's repeated admission that the decision to revoke access to SoftServe was simply that: A decision. See, e.g., ¶ 6, supra (admitting that 'Netsmart terminated access to its systems for Ukraine-based SoftServe associates'[)]; see also Opposition p. 16 (admitting that Netsmart made the 'decision to terminate SOW #7 [and] the MSA'); id. p. 18 (admitting that 'Netsmart halted performance of it obligations under Section 15 of the parties' MSA.')

> "Conversely, there is no evidence that Netsmart is, was, or has at any relevant time been 'prevented . . . from providing electronic access to its systems in Ukraine' as asserted.

> "The foregoing notwithstanding, it is uncontroverted and immaterial that Netsmart inquired as to alternate performance locations as described."

26

Moreover, in its Response to Netsmart's Motion for Summary Judgment, SoftServe argued that Netsmart's invocation of the force majeure was flawed because the risk of the war preventing performance was only "hypothetical" and "anticipated" and that Netsmart's "fear of malware was a pretext" for cancelling the contract. It also appears that while SoftServe did not dispute that Netsmart's actions to avoid a malware problem occurred, whether they were motivated by "rational fear" was a credibility question for the jury to decide, and inappropriate for resolution on summary judgment.

In granting summary judgment for Netsmart, the district court reasoned that it need not delve into Netsmart's psyche to determine its motivation for deciding whether to invoke force majeure "because the clear language of the force majeure provision allows a party to invoke force majeure not only in the event of 'war' but also in the event of 'hostilities and civil unrest.'" That is, the district court found that the war in Ukraine constituted a force majeure event because Section 16 of the MSA defined force majeure to include "war" and "hostilities and civil unrest." But proper resolution of the summary judgment motion is not that simple. Application of the force majeure clause requires not only the occurrence of a force majeure event, but also that the event causes a party's nonperformance. The summary judgment pleadings reflect that SoftServe and Netsmart dispute whether the war actually caused Netsmart's nonperformance.

Similarly, SoftServe alleges that the district court ignored material disputes over the continuation of the force majeure event—that is, whether Netsmart could have taken reasonable steps to overcome the force majeure event. The force majeure provision's liability shield ends either when the force majeure event ends or when it "would have ended had the non-performing Party taken those steps which it could reasonably have been expected to take to overcome the Force Majeure provided it could be overcome." SoftServe is not arguing that Netsmart could have taken any steps to end the war in

27

Ukraine. But it is asserting that there was a dispute about whether the parties could have mitigated the effect of the war and continued their contractual relationship.

The district court's findings of fact include several findings reflecting that—from SoftServe's point of view—Netsmart could have taken reasonable steps to overcome the effect of the war:

"37. On January 25, 2022, one day after Netsmart signed SOW #7, SoftServe presented its first 'Business Continuity Plan' to Netsmart outlining potential scenarios that could take place in Ukraine.

. . . .

"42. SoftServe also represented to Netsmart in its First Business Continuity Plan a summary (titled 'Netsmart BCP [Business Continuity Plan] Summary'). In the summary, SoftServe highlighted the ease and efficiency with which 90% of its team members could relocate to the EU and noted that 'SoftServe EU and US locations have capacity to accommodate the relocated teams timely.

. . . .

"62. In the March 8, 2022, letter, SoftServe claimed Netsmart's systems were not under any actual threat, that Netsmart had an obligation to somehow 'mitigate' the force majeure, that SoftServe for its part had 'mitigated the alleged risk,' and that 'SoftServe has in place and has already implemented [the First Business Continuity Plan].

. . . .

"64. On March 15, 2022, the parties met to discuss their relationship. SoftServe accused Netsmart of 'simply wanting to terminate the contract and [] using the Ukraine crisis as a method to do so.' Netsmart 'shared that was not the case' and Netsmart 'asked for alternative solutions or paths forwards, outside continuing to rely on workers inside Ukraine. We would prefer individuals in Latin America vs. Eastern Europe if possible.

"65. On March 22 or 23, 2022, SoftServe met with Netsmart and provided Netsmart with a proposed Second Business Continuity Plan, which would transition SoftServe's Netsmart work out of Ukraine and to Latin America.

28

"66. In SoftServe's Second Business Continuity Plan, SoftServe outlined a new timeline of 9 to 12 months to complete the transition of SoftServe resources from Ukraine to Latin America.

. . . .

"68. Netsmart rejected SoftServe's Second Business Continuity Plan proposal in a March 28, 2022, letter.

"69. In the March 28, 2022, letter, Netsmart confirmed it 'remain[ed] open to further conversations that may support certain subject matter experts under a new MSA and SOW outside locations of high security risk. If you are open and amenable to this conversation and potential path to continue our partnership under a more reasonable economic model, we welcome the conversation."

Netsmart disputed SoftServe's assertion that it could have taken steps to mitigate the effect of the war, as reflected by additional findings made by the district court. But the district court necessarily resolved those factual disputes in Netsmart's favor to reach the result that it did. The record shows there was evidence from both sides about whether the effects of the war could have been mitigated. The parties agreed that they attempted to craft a Business Continuity Plan that would address potential scenarios in Ukraine and that they looked into a second such plan after the war began. But the plans were never put into action when Netsmart ultimately rejected them. That said, the record also shows that Netsmart stated in one of its correspondences that it was still looking for "alternative solutions or paths forwards, outside continuing to rely on workers inside Ukraine" at the time that it rejected SoftServe's Second Business Continuity Plan. Despite indications that such discussions were on the table, the district court appears to have found that Netsmart could not have taken any further steps to mitigate the effect of the ongoing war.

To avoid summary judgment, SoftServe had to come forth with evidence to support a reasonable inference that Netsmart could not properly invoke the force majeure clause. At the summary judgment stage, the district court needed to resolve all facts and inferences in SoftServe's favor. The record shows that the parties submitted contrasting

29

evidence about whether the war in Ukraine caused Netsmart's nonperformance, whether the war continued to prevent Netsmart from performing, and whether Netsmart could have taken steps to overcome the situation. Because there are genuine disputes of material facts about the application of the force majeure clause, we conclude the district court erred in granting summary judgment in Netsmart's favor.

Before moving to the next issue, we find that Netsmart is not entitled to summary judgment against SoftServe based on the district court's alternative finding that the "Limitation of Liability" provision in Section 17 of the MSA limited SoftServe's recovery of its early termination fee. The district court clarified this finding was "not a dispositive factor in the Court's decision," and the parties devoted little attention to it in their briefs on appeal. Our reading of the district court's written decision leads us to conclude that the district court granted summary judgment for Netsmart only because it found there were no disputed facts preventing Netsmart from invoking force majeure—a conclusion we do not share. The "Limitation of Liability" provision in Section 17 of the MSA may be relevant to whether SoftServe qualifies for summary judgment; it does not provide Netsmart with an independent legal basis for summary judgment.

DID THE DISTRICT COURT ERR IN DENYING SUMMARY JUDGMENT TO SOFTSERVE?

Turning to whether the district court correctly denied SoftServe's motion for summary judgment, SoftServe argues that the only contractual authority Netsmart had to terminate the contract was the without-cause provision of SOW #7, that clause mandated Netsmart pay an early termination charge, and that the evidence shows that Netsmart breached the contract when it refused to pay. Netsmart contends that the district court correctly denied SoftServe's motion for summary judgment because genuine issues of material fact prohibit SoftServe from securing summary judgment.

30

As we explained in the last section of this opinion, the district court correctly found that the force majeure clause in the MSA, if properly invoked, relieved Netsmart from performing under the contract. But there remain questions of fact on whether the outbreak of the war in Ukraine actually caused Netsmart's nonperformance and whether Netsmart could have taken reasonable steps to overcome the force majeure event. These same disputed facts preclude SoftServe from receiving summary judgment against Netsmart for breach of contract. But even if this court would find that SOW #7 controls the outcome of this case, the district court was still correct to deny SoftServe's motion for summary judgment based on the existence of disputed material facts.

The district court found that SOW #7 did not apply because Netsmart's termination was not without cause. But, if SOW #7 did apply, there are disputed material facts about when the termination actually occurred and which party terminated the contract. These factual disputes include: (1) whether the parties' contract was terminated by Netsmart's February 28, 2022 letter or on some later date; (2) whether Netsmart's attempt to provide notice of termination in the February 28, 2022 letter under Section 5(b)(i) of the MSA acted as notice of termination under Section 11.2 of SOW #7; (3) whether SoftServe terminated the contract when it sent the invoice for the early termination payment; (4) whether SoftServe terminated the contract when it let go the sole remaining team member who was servicing Netsmart from outside of Ukraine; and (5) whether the limitation of liability provision in the MSA applied to restrict SoftServe's potential recovery.

The key factual dispute, which the parties continue to debate in their briefs and the district court did not explicitly resolve, is on what day the contract was terminated. As noted above, SoftServe repeatedly asserts that Netsmart terminated their contract on February 28, 2022, when it sent its initial letter invoking force majeure and Section 5(b)(i) of the MSA. Netsmart disagrees—it suggests that SoftServe terminated the contract either when it fired the only employee who was permitted to access its network

31

or when it sent the invoice seeking the early termination payment. Moreover, as Netsmart notes, even after the February 28, 2022 notice was sent, the parties did not act as if the contracts were terminated and continued to discuss potential contingency plans. When resolving all facts and inferences in Netsmart's favor, reasonable persons could reach different conclusions about when and how the contract was terminated.

In closing, although the parties present competing motions for summary judgment based on the same record, that does not mean that either motion must be granted. In some cases, the parties can submit identical facts subject to more than one reasonable interpretation, making summary judgment inappropriate for either party. This is one of those cases—the evidence including the contracts, correspondence, and other exhibits attached to the summary judgment pleadings are subject to more than one reasonable interpretation. When the facts are viewed in the light most favorable to Netsmart, SoftServe is not entitled to summary judgment. When the identical facts are viewed in the light most favorable to SoftServe, Netsmart is not entitled to summary judgment. Thus, we affirm the district court's denial of SoftServe's motion for summary judgment and reverse its decision granting Netsmart's motion and remand for further proceedings.

Affirmed in part, reversed in part, and remanded.